2011 UT 56

STATE of Utah, Plaintiff,

v.

Branson Parduhn, Defendant
and Appellant.

Salt Lake County, Intervenor
and Appellee.

State of Utah, Plaintiff,

v.

Randy Fetch JEFFS, Defendant
and Appellant.

Salt Lake County, Intervenor
and Appellee.

State of Utah, Plaintiff,

v.

Antony Davis, Defendant and Appellant.

Salt Lake County, Intervenor
and Appellee.

Nos. 20090744, 20090737, 20090816.

Supreme Court of Utah.

Sept. 27, 2011.

Jonathon W. Grimes, Edward D. Flint, Sean F. Hullinger, Salt Lake City, for appellant Branson Parduhn.

David O. Drake, Midvale, for appellant Randy Fetch Jeffs.

Sean B. Druyon, Bountiful, for appellant Antony Davis.

Donald H. Hansen, Craig J. Wangsgard, Salt Lake City, for appellee, Salt Lake County.

Joan C. Watt, Patrick L. Anderson, Salt Lake City, for amicus Salt Lake Legal Defender Association.

William K. McGuire, Troy S. Rawlings, Farmington, for amicus Utah Association of Counties.

Associate Chief Justice DURRANT, opinion of the Court:

## INTRODUCTION

¶ 1 In this opinion, we address issues raised in three consolidated cases: (1) *State v. Parduhn*, (2) *State v. Jeffs*, and (3) *State v. Davis*. All three cases come to us on interlocutory appeal and involve nearly identical facts and issues. Mr. Parduhn, Mr. Jeffs, and Mr. Davis (collectively, the Defendants) have all been charged with crimes in Salt Lake County (the County). Although each of the Defendants was found to be indigent, and therefore qualified for representation by a public defender, each of the Defendants retained private attorneys. Sometime after retaining their attorneys, each of the Defendants filed a motion in the district court[1] requesting funding for expert witnesses and other defense resources. After determining that the Defendants had all failed to demonstrate a "compelling reason" for the funding they requested, the district court denied these motions.

¶ 2 On appeal, we are asked to resolve two issues. First, we must determine whether our holding in *State v. Burns*—that the Utah Indigent Defense Act (the Act) requires local governments to provide indigent defendants with funding for necessary defense resources, even when the defendant is represented by private counsel[2]—remains good law after amendments to the Act. Second, we must decide whether the district court erred in requiring the Defendants to demonstrate a compelling reason for the funding they requested from the County.

¶ 3 We first hold that the amendments to the Act have not overruled or superseded our holding in *Burns*. We reach this conclusion based on the plain language of the Act, which expressly states that local governments must provide indigent defendants with funding for necessary defense resources and does not condition the availability of such funding on a defendant's representation by public counsel. Second, we hold that the district court erred in requiring the Defendants to demonstrate a compelling reason for the funding they requested. The Act requires a defendant to demonstrate a compelling reason to receive funding for defense resources *only* when a local government has contracted to provide such resources to *all* indigent defendants, and the County has conceded that it has not so contracted. Based on these conclusions, we reverse the district court's denial of the Defendants' motions for funding and remand the Defendants' cases for further proceedings consistent with this opinion.

## BACKGROUND

¶ 4 The following discussion provides a brief overview of the factual background in each of the Defendants' cases and of the arguments asserted by the Defendants and the County on appeal.

### I. *STATE V. PARDUHN*

¶ 5 In 2007, the County charged Branson Parduhn with five counts of forgery, a third degree felony, and two counts of theft by deception, also a third degree felony. At Mr. Parduhn's initial appearance on these

---

1. Although the Defendants' motions were heard by different judges, the motions were all filed in Third District Court. For the sake of clarity, we use the singular "district court" to refer to the

three separate orders rejecting the Defendants' motions.

2. *See* 2000 UT 56, ¶ 32, 4 P.3d 795.

charges, the district court concluded that he was indigent and appointed the Salt Lake Legal Defenders Association (LDA) to represent him. Sometime thereafter, Mr. Parduhn received a one-time monetary gift from his grandparents that he used to retain private counsel. After he retained private counsel, LDA withdrew from representation.

¶ 6 Several months later, Mr. Parduhn filed a motion in the district court in which he requested that the court order the County to provide him with funding to hire a handwriting analyst to examine the instruments he allegedly forged. After hearing arguments on the motion, the district court found that, despite Mr. Parduhn's ability to retain private counsel, he remained indigent. But the court denied Mr. Parduhn's motion after concluding that he had failed to demonstrate a "compelling reason" for the funding he requested.

¶ 7 After the district court rejected his motion for funding, Mr. Parduhn filed a petition for interlocutory appeal with the Utah Court of Appeals. The court of appeals granted the petition and certified the case to us.

## II. STATE V. JEFFS

¶ 8 In 2008, the County charged Randy Jeffs with four counts of attempted aggravated murder, a first degree felony, one count of attempted unlawful discharge of a firearm, a third degree felony, and one count of domestic violence in the presence of a child, also a third degree felony. The County also charged Mr. Jeffs with one count of reckless endangerment, a class A misdemeanor, and one count of interfering with arrest, a class B misdemeanor. At Mr. Jeffs's initial appearance on these charges, the district court found him to be indigent and appointed LDA to represent him. Sometime thereafter, Mr. Jeffs retained private counsel, and LDA withdrew from representation.

¶ 9 Several months later, Mr. Jeffs filed a motion in the district court in which he requested that the court order the County to provide him with funding to hire a private investigator, a ballistics expert, and a medical expert. After hearing arguments on the motion, the district court found that, despite Mr. Jeffs's ability to retain private counsel, he remained indigent. But the court denied Mr. Jeffs's motion after concluding that he had failed to demonstrate a "compelling reason" for the funding he requested.

¶ 10 After the district court rejected his motion for funding, Mr. Jeffs filed a petition for interlocutory appeal, which we granted.

## III. STATE V. DAVIS

¶ 11 In 2009, the County charged Antony Davis with two counts of rape of a child, a first degree felony, and two counts of aggravated sexual abuse of a child, also a first degree felony. At Mr. Davis's initial appearance on these charges, the district court found him to be indigent and appointed LDA to represent him. Sometime thereafter, Mr. Davis retained private counsel, and LDA withdrew from representation.

¶ 12 Several months later, Mr. Davis filed a motion in the district court in which he requested that the court order the County to provide him with "funds to pay experts and investigators necessary to adequately prepare for trial." After hearing arguments on the motion, the district court found that, despite Mr. Davis's ability to retain private counsel, he remained indigent. But the court denied Mr. Davis's motion after concluding that he had failed to demonstrate a "compelling reason" for the funding he requested.

¶ 13 After the district court rejected his motion for funding, Mr. Davis filed a petition for interlocutory appeal, which we granted.

## IV. ARGUMENTS ON APPEAL

¶ 14 On appeal, the Defendants argue that the plain language of the Act requires local governments to provide an indigent defendant with the defense resources necessary for a complete defense, even if the defendant is represented by private counsel. In support of this position, the Defendants contend that our holding in State v. Burns[3] remains good law and is determinative in this case. Second, they argue that the compelling-rea-

**3.** 2000 UT 56, 4 P.3d 795.

son standard articulated in the Act applies *only* when a local government has contracted with an entity to provide necessary defense resources to *all* indigent defendants and that the County has not so contracted. Accordingly, the Defendants contend that the district court should not have required them to demonstrate a compelling reason for the funding they requested.[4]

¶ 15 In opposition, the County raises three arguments. First, it contends that our holding in *Burns* is no longer good law and is not controlling on the issue of whether local governments are required to provide indigent defendants represented by private counsel with funding for necessary defense resources. Second, it argues that "LDA is the exclusive source from which indigent legal defense resources, including expert witnesses, may be provided, unless a court, after proper notice and a hearing, finds a compelling reason for the appointment of a noncontracting defense resource." Finally, the County claims that the district court correctly concluded that the Defendants had failed to demonstrate a compelling reason for the funding they requested. We have jurisdiction to hear these appeals pursuant to sections 78A-3-102(3)(b) and 78A-3-102(3)(h) of the Utah Code.

## STANDARD OF REVIEW

■ ¶ 16 "We review questions of statutory interpretation for correctness, affording no deference to the district court's legal conclusions."[5]

4. The Defendants also argue that even if a right to necessary defense resources is not provided by statute, and even if *Burns* is no longer good law, the equal protection clause and right to due process require that the County provide them with the funding they have requested. Because we resolve the issues presented in this appeal on statutory grounds, we do not address these constitutional arguments.

5. *State v. Gallegos*, 2007 UT 81, ¶ 8, 171 P.3d 426.

6. U.S. Const. amend. VI.

7. 332 U.S. 134, 136–37, 67 S.Ct. 1716, 91 L.Ed. 1955 (1947).

8. *See* 372 U.S. 335, 339–45, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

## ANALYSIS

■ ¶ 17 Before reaching the merits of the questions on appeal, we first provide some background concerning the rights of indigent criminal defendants. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."[6] In *Foster v. Illinois*, the United States Supreme Court explained that this provision requires that "counsel . . . be furnished to an indigent defendant prosecuted in a federal court in every case, whatever the circumstances."[7] Subsequently, in *Gideon v. Wainwright*, the Court concluded that the Sixth Amendment right to counsel was a fundamental right.[8] As a result of this status, the right to counsel is now applicable to the states through the Due Process Clause of the Fourteenth Amendment.[9]

¶ 18 In several cases, the Supreme Court has held, as a matter of due process, that the right to counsel includes *effective* assistance of counsel.[10] In furtherance of this principle, in *Ake v. Oklahoma* the Court explained that for counsel to be effective in the case of an indigent defendant, the state must provide the defendant with "access to the raw materials integral to the building of an effective defense."[11] Similarly, in *Britt v. North Carolina* the Court held, "as a matter of equal protection," that a state must "provide indigent [defendants] with the basic tools of an adequate defense or appeal, when[ever] those tools are available for a price to other [defendants]."[12]

9. *See id.* at 341–42, 83 S.Ct. 792; *see also State v. Burns*, 2000 UT 56, ¶ 22, 4 P.3d 795.

10. *See, e.g., Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Reece v. Georgia*, 350 U.S. 85, 89–90, 76 S.Ct. 167, 100 L.Ed. 77 (1955).

11. 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

12. 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971).

¶ 19 To ensure compliance with the requirements that indigent defendants receive effective assistance of counsel and "access ... to the basic tools of [a] defense," [13] the Utah Legislature enacted the Utah Indigent Defense Act.[14] Four sections of the Act are relevant to these appeals. First, section 301 (the Minimum Standards Provision) requires local governments to provide all indigent defendants with a legal defense comprised of six components—two of which are "counsel" and "investigatory resources necessary for a complete defense." [15] Second, section 302 (the Assignment Provision) states that "[l]egal counsel shall be assigned to represent each indigent and the indigent shall also be provided access to defense resources [16] necessary for an effective defense ... if: (a) the indigent requests counsel *or* defense resources, *or* both; or (b) the court on its own motion ... orders counsel, defense resources, *or* both." [17] Third, to ensure compliance with the requirements set forth in the Act, section 306 (the Compliance Provision) mandates that local governments "shall either: (a) contract to provide the legal defense, including counsel, defense resources, or both ...; or (b) authorize the court to provide the services prescribed by [the Act]." [18] Finally, to reduce the costs associated with providing these resources, section 303 (the Hearing Provision) states that *if* "a [local government] has contracted for, or otherwise made arrangements for, the legal defense of indigents, including a competent attorney *and* defense resources," a court may not appoint a noncontracting attorney or defense resource without first conducting a hearing and finding a *compelling reason* to do so.[19]

¶ 20 In the instant case, we are asked to determine whether our holding in *State v. Burns*[20]—that the Act requires local governments to provide indigent defendants with funding for necessary defense resources, even when the defendant is represented by private counsel—remains good law after amendments to the Act. Additionally, if we find that indigent defendants represented by private counsel are statutorily entitled to government funding for defense resources, we must determine whether the district court erred in requiring the Defendants to demonstrate a compelling reason to receive funding for the defense resources they requested. Both of these issues involve questions of statutory interpretation.

¶ 21 "When faced with a question of statutory interpretation, our primary goal is to evince the true intent and purpose of the Legislature." [21] To discern legislative intent, we first look to the plain language of the statute.[22] "As part of our plain language analysis, we read the language of the statute as a whole and also in its relation to other statutes." [23] "In so doing, we read each term according to its ordinary and accepted mean-

---

13. *Burns*, 2000 UT 56, ¶ 24, 4 P.3d 795.

14. *See id.* ("[D]ecisions by the United States Supreme Court ... prompted states to implement acts such as the Utah Indigent Defense Act ... to ensure that the Sixth Amendment right to effective assistance of counsel includes access for indigents to the basic tools of defense."); Utah Code Ann. § 77–32–101 (2008). Because there have been no substantive changes to the statutes since the Defendants filed their motions, we cite to the current version of the Act unless otherwise indicated.

15. *See* Utah Code Ann § 77–32–301. The other four components listed in the Minimum Standards Provision are "timely representation by competent legal counsel"; "undivided loyalty of defense counsel"; "a first appeal of right"; and the duty to "prosecute other remedies before or after a conviction, considered by defense counsel to be in the interest of justice except for other and subsequent discretionary appeals or discretionary writ proceedings." *Id.*

16. The Act defines defense resources as "a competent investigator, expert witness, or other appropriate means necessary, for an effective defense of an indigent, but ... not includ[ing] legal counsel." *Id.* § 77–32–201(3) (Supp.2011).

17. *Id.* § 77–32–302(1) (2008) (emphases added).

18. *Id.* § 77–32–306(1).

19. *Id.* § 77–32–303 (emphasis added).

20. 2000 UT 56, 4 P.3d 795.

21. *In re Adoption of R.B.F.S.*, 2011 UT 46, ¶ 12, 258 P.3d 583 (internal quotation marks omitted).

22. *See id.*

23. *Id.* (internal quotation marks omitted).

ing."[24] "We also assume that each term included in the statute was used advisedly, and we seek to give effect to every word, clause[,] and sentence ... if such can be reasonably done."[25]

¶ 22 Utilizing these rules of statutory interpretation, we first conclude that the amendments to the Act have not overruled or superseded our holding in *Burns*. We therefore reaffirm that local governments are statutorily required to provide an indigent defendant with funding for necessary defense resources, even when the defendant is represented by private counsel. Additionally, because the County has conceded that it has not contracted with any entity to provide defense resources to indigent defendants represented by private counsel, we hold that the district court erred in requiring the Defendants to demonstrate a compelling reason for the funding they requested.

## I. THE ACT'S PLAIN LANGUAGE REQUIRES LOCAL GOVERNMENTS TO PROVIDE AN INDIGENT DEFENDANT WITH FUNDING FOR NECESSARY DEFENSE RESOURCES EVEN WHEN THE DEFENDANT IS REPRESENTED BY PRIVATE COUNSEL

¶ 23 In *State v. Burns*, this court was asked to determine whether "a trial court [could] require a defendant to accept [a public defender] in order to qualify for ... state-funded [expert] assistance."[26] To resolve this question, we turned to the language of the then-applicable Minimum Standards Provision of the Act.[27] That provision required local governments to provide for the defense of indigents in accordance with the following minimum standards:

(1) Provide *counsel* for every indigent person who faces the substantial probability of the deprivation of his liberty;

(2) Afford timely representation by competent legal counsel;

(3) Provide the *investigatory* and other facilities necessary for a complete defense;

(4) Assure undivided loyalty of defense counsel to the client; and

(5) Include the taking of a first appeal of right and the prosecuting of other remedies before or after a conviction, considered by the defending counsel to be in the interest of justice except for other and subsequent discretionary appeals or discretionary writ proceedings.[28]

¶ 24 After reviewing this language, we determined that the separate and discrete listing of these subsections was "an indication that the right to counsel stands separate and distinct from the right to the investigatory [resources] ... necessary for a complete defense."[29] We also indicated that "it [was] clear from the plain language of [the Minimum Standards Provision] that a county must provide the investigatory [resources] ... necessary for a complete defense to *every* indigent person, [and] *not* just to those represented by [public counsel]."[30] Because we recognized that the right to necessary defense resources was a separate and distinct right from the right to counsel, we held that a district court could not require a defendant to accept public counsel in order to qualify for state-funded defense resources.[31]

¶ 25 In 2001, after we issued our opinion in *Burns*, the Legislature revised several sections of the Act by adding the term "defense resources."[32] For instance, whereas the preamendment version of the Assignment Provision stated that "[c]ounsel shall be as-

24. *Id.* (internal quotation marks omitted).

25. *Id.* (second alteration in original) (internal quotation marks omitted).

26. 2000 UT 56, ¶ 15, 4 P.3d 795.

27. *See id.* ¶ 26.

28. *Id.* (emphases added) (quoting Utah Code Ann § 77–32–1 (1990)).

29. *Id.* ¶ 28 (internal quotation marks omitted).

30. *Id.* (emphases added) (internal quotation marks omitted).

31. *Id.* ¶ 32.

32. *See* Utah Code Ann §§ 77–32–101 to –308 (2001). Since 2001, the Act has also been revised and amended on other occasions; however, only the revisions made in the 2001 amendments are relevant to the issues raised in these appeals.

signed to represent each indigent," [33] the revised Act states that "[l]egal counsel shall be assigned to represent each indigent *and the indigent shall also be provided access to defense resources necessary for an effective defense.*" [34] Similarly, whereas the preamendment version of the Assignment Provision stated that a court was required to "make findings that there [was] a compelling reason [before] appoint[ing] a noncontracting attorney," [35] the current version states that a court must find "that there is a compelling reason [before] appoint[ing] a noncontracting attorney *or defense resource.*" [36] The County contends that these amendments were "specifically intended to overrule this court's holding in *Burns*" and that the amendments have achieved this supposed purpose. We disagree that the 2001 amendments have overturned our holding in *Burns*. We also disagree with the County's contention that the 2001 amendments were designed to achieve that result.

¶ 26 First, nothing in the plain language of the 2001 amendments conflicts with our holding in *Burns*. To the contrary, as noted above, the revised Assignment Provision includes an express statement that all indigent defendants "shall ... be provided access to defense resources necessary for an effective defense." [37] Additionally, the revised Act ex-

pressly contemplates the provision of defense resources to indigent defendants separate and apart from the provision of counsel.[38] For instance, the revised Assignment Provision requires that "[l]egal counsel ... be assigned to represent each indigent and [that] the indigent shall also be provided access to defense resources ..., *if* ... the indigent requests counsel *or* defense resources, *or* both." [39] Similarly, the revised Assignment Provision expressly states that a court may assign "counsel, defense resources, *or* both" to an indigent defendant.[40] Moreover, like the preamendment version of the Act at issue in *Burns*, the current version of the Minimum Standards Provision contains several discrete subsections, which include the right to "counsel" and the right to "investigatory resources necessary for a complete defense." [41] And as we suggested in *Burns*, the separate and discrete listing of these subsections strongly indicates that the Legislature intended for "the right to counsel [to] stand[ ] separate and distinct from the right to the investigatory [resources]." [42] Furthermore, like the preamendment version of the Act analyzed in *Burns*, nothing in the revised Act suggests that a defendant must be represented by public counsel in order to receive funding for necessary defense re-

33. *Id.* § 77–32–302(1) (2000).

34. *Id.* § 77–32–302(1) (2008) (emphasis added).

35. *Id.* § 77–32–302(2)(c)(iii) (2000).

36. *Id.* § 77–32–302(2)(e)(iii) (2008) (emphasis added).

37. *Id.* § 77–32–302(1).

38. *See, e.g., id.* §§ 77–32–301, –302, –303, –306.

39. *Id.* § 77–32–302(1)(a) (emphases added). The dissenting opinion contends that the Legislature's use of the term "and" in the revised Assignment Provision "provides the bundling requirement that was missing in the statute construed in *Burns*." *Infra* ¶ 44. Similarly, the dissenting opinion states that the Legislature's inclusion of the term "and" confirms that the Act requires that counsel and defense resources "be provided together or not at all." *Infra* ¶ 60. We respectfully disagree. The revised Assignment Provision certainly requires a local government to provide an indigent defendant with both "[l]egal counsel ... and ... access to defense resources." Utah Code Ann. § 77–32–

302(1). But the fact that a defendant has the right to both counsel and defense resources does not necessarily lead to the conclusion that the defendant must accept both or be entitled to neither. Moreover, even if we were to accept the dissent's argument that a request for only defense resources "automatically triggers the mandatory provision of *both* counsel *and* defense resources," *infra* ¶ 62, we see no textual support for prohibiting a defendant from waiving his right to government-funded counsel and electing to utilize only government-funded defense resources. And we therefore decline to read such a substantive limitation into the Act. *See, e.g., Berrett v. Purser & Edwards,* 876 P.2d 367, 370 (Utah 1994) ("[C]ourts are not to infer substantive terms into the text [of a statute] that are not already there.").

40. Utah Code Ann § 77–32–302(1)(b) (emphasis added).

41. *Id.* § 77–32–301.

42. 2000 UT 56, ¶ 28, 4 P.3d 795 (internal quotation marks omitted).

sources. Instead, like the preamendment version of the Act, the revised Act requires that defense resources be provided to "each indigent." [43] Accordingly, because the plain language of the revised Act remains consistent with our holding in *Burns*, we reject the County's argument that *Burns* is no longer good law.

■■■■ ¶ 27 Second, although we rely exclusively on the plain language of the Act to reach our conclusion that our holding in *Burns* remains good law, we note that the legislative history that accompanies the 2001 amendments contradicts the County's position that the Legislature "clearly intended" for the 2001 amendments to overturn *Burns*.[44] Indeed, our review of this legislative history strongly suggests that the amendments were specifically designed to ensure compliance with the separate and distinct right to defense resources recognized in *Burns* and to provide a cost-saving mechanism through which local governments could provide that right.[45] For instance, in providing an introduction and overview of the 2001 amendments, Senator Lyle Hillyard explained to the Senate that "a recent Utah Supreme Court case . . . said that if [a defendant's] money is all gone spending for the lawyer, then he gets appointed the expert that he needs for his case." [46] Senator Hillyard then specifically stated that the proposed amendments "basically sa[id] . . . that *we acknowledge this right*," and that the amendments were designed to provide a way for local governments to limit what they have to pay to comply with the right.[47]

¶ 28 Similarly, the day after Senator Hillyard's comments, Senator David Gladwell read the proposed amendments to the Senate. Before proceeding with the reading, Senator Gladwell provided the following summary of the amendments' purposes:

> If an indigent is charged with a crime and there is a substantial probability that he will go to jail or prison, under current law he is given representation by counsel and if the county or municipality . . . has contracted with a legal aid association to provide that representation, then the judge must order that the representation be provided by that contracted service. That is *not* the case with other defense resources such as expert witnesses or investigators. Right now there is no such requirement. This bill simply *modifies* the current language so that *if* a county or a municipality has contracted for those defense resources, then a judge is obligated to require that the defense resources be provided by that contract *merely as a way of keeping costs in check*.[48]

---

**43.** UTAH CODE ANN. § 77-32-302(1); *see also Burns*, 2000 UT 56, ¶ 28, 4 P.3d 795 (recognizing that the Act requires the provision of defense resources to *"every* indigent" (emphasis added)).

**44.** The dissenting opinion suggests that statements of individual legislators should not be used to contradict the plain language of a statute. *See infra* ¶ 65. We agree with this general rule. But as noted above, the legislative statements quoted in this opinion are *not* offered to bolster our interpretation of the text of the Act. Instead, we look to the legislative history of the Act *only* to demonstrate that the County's argument—that the 2001 amendments were "clearly intended" to overturn *Burns*—lacks merit.

**45.** *See* RECORDING OF UTAH SENATE FLOOR DEBATES, S.B. 154, 54TH LEG., GEN. SESS. (Feb. 12–13, 2001) (statement of Sen. Hillyard), *available at* http://le.utah.gov/asp/audio /index.asp?sess=2001 GS&Day=O&Bill=SB0154&House=s.

**46.** *Id.*

**47.** *Id.* (emphasis added).

**48.** *Id.* (statement of Sen. Gladwell) (emphases added). The dissent contends that statements made by Representative Greg Curtis provide support for the County's argument that the Legislature intended for the 2001 amendments to overturn *Burns*. *See infra* ¶¶ 69–70. We acknowledge that Representative Curtis's statements may be read as suggesting that an indigent defendant must use LDA for both counsel and defense resources or must show a compelling reason to receive defense resources. But, as noted above, the statements of Senators Hillyard and Gladwell suggest otherwise. Furthermore, we note that Representative Curtis's statements contradict the plain language of the Act, which expressly states that a court may assign "counsel, defense resources, *or both* " to an indigent defendant. UTAH CODE ANN. § 77-32-302(1)(b) (emphasis added). And, as the dissent correctly recognizes, statements of individual legislators "should not be entitled to any weight" when the statements contradict the plain language of a statute. *See infra* ¶ 64.

¶ 29 Had the Legislature intended to overturn *Burns*, it could have easily modified the language of the Minimum Standards Provision or otherwise included a requirement in the Act that to receive funding for defense resources an indigent defendant must be represented by public counsel. But the Legislature did not make such changes and instead left the statutory language we relied on in *Burns* virtually the same. Accordingly, based on this legislative history, and the plain language of the revised Act, we reject the County's argument that the 2001 amendments were "clearly intended to overturn *Burns*." [49]

■■■ ¶ 30 In sum, based on the Act's plain language, we hold that our conclusion in *Burns* remains good law. Specifically, we reaffirm that the Act requires local governments to provide an indigent defendant with funding for necessary defense resources, even when the defendant is represented by private counsel.

## II. THE DISTRICT COURT ERRED IN REQUIRING THE DEFENDANTS TO DEMONSTRATE A COMPELLING REASON FOR THE FUNDING THEY REQUESTED

¶ 31 Having determined that indigent defendants may be entitled to funding for necessary defense resources even when they are represented by private counsel, the next issue we must resolve is whether the district court erred in requiring the Defendants to demonstrate a compelling reason for the funding they requested.

¶ 32 As explained above, the plain language of the Act requires local governments to provide indigent defendants with both effective counsel *and* "the investigatory resources *necessary* for a complete defense." [50] Because the right to counsel and the right to necessary defense resources are separate and distinct rights under the Act, a local government may not condition a defendant's ability to receive funding for defense resources on the defendant's representation by public counsel. [51] A local government may, however, contract with one or more entities to fulfill its statutory obligations to indigent defendants. [52] Specifically, the Act's Compliance Provision states that a local government "shall either: (a) contract to provide the legal defense, including counsel, defense resources, or both ... through ... (I) a legal aid association; or (ii) one or more defense associations or attorneys and qualified defense resources; or (b) authorize the court to provide the services." [53] The Act further specifies that *if* "a [local government] has contracted for, or otherwise made arrangements for, the legal defense of indigents, *including* a competent attorney *and* defense resources," [54] the contracted entity is "the *exclusive source* from which the legal defense may be provided" [55] unless the court "makes a finding that there is a *compelling reason* to authorize or designate a noncontracting attorney or [defense] resource[ ]." [56]

■■■ ¶ 33 When read in harmony, the Act's provisions create a four-step process

**49.** The dissent also acknowledges that "the legislature could have adopted language that more explicitly overruled *Burns*," but asserts that this "tells us next to nothing" because "[i]n any case that warrants our careful attention, it will most always be true that the legislature could have spoken more precisely." *Infra* ¶ 70 n. 12 (internal quotation marks omitted). While this may be true in some cases, here the 2001 amendments were explicitly intended to address our *Burns* decision. In this context, it is telling that the Legislature did not include a simple sentence to the effect that a defendant's entitlement to defense resources is conditioned upon the defendant's acceptance of a public defender. Instead, the Legislature left unchanged the key language we relied upon in *Burns* and included language specifically contemplating that a court could order "counsel, defense resources, or both," UTAH

CODE ANN. § 77–32–302(1)(b), for an indigent defendant.

**50.** UTAH CODE ANN. § 77–32–301(3) (2008) (emphasis added).

**51.** *See State v. Burns*, 2000 UT 56, ¶ 28, 4 P.3d 795.

**52.** *See* UTAH CODE ANN § 77–32–306.

**53.** *Id.* § 77–32–306(1).

**54.** *Id.* § 77–32–303 (emphases added).

**55.** *Id.* § 77–32–306 (emphasis added).

**56.** *Id.* § 77–32–303(2) (emphasis added).

that a court must utilize to determine whether a defendant who is represented by private counsel qualifies for government funding for a requested defense resource.[57] First, the court must decide whether the defendant is *indigent*.[58] Second, if the court finds that the defendant is indigent, it must determine whether the defense resources requested by the defendant are *necessary* for a complete defense.[59] Third, if the court finds that the first two steps are satisfied, it must determine whether the relevant local government has *contracted* to provide defense resources to *all* indigent defendants.[60] In making this determination, it is important to remember that a local government *cannot* condition funding for defense resources on appointment of public counsel.[61] Thus, a contract that conditions funding for defense resources on the appointment of public counsel does not qualify as a contract that provides for a complete legal defense—including defense resources—for all indigent defendants. Therefore, it does not trigger the Act's exclusive source provision. Finally, if the court determines that the local government has contracted to provide defense resources to all indigent defendants, including those represented by private counsel, the court must order the entity named in the contract to provide the resource requested by the defendant, unless the defendant demonstrates a

*compelling reason* for appointment of a noncontracting resource.[62] Alternatively, if the court determines that the local government has not contracted to provide defense resources to all indigent defendants, the court must order the local government to provide funding for the necessary defense resources requested by the defendant.[63]

¶ 34 In the instant case, after determining that each of the Defendants was indigent, the district court proceeded directly to the third step in this process and concluded that the County had contracted with LDA to provide defense resources to all indigent defendants. The district court therefore reasoned that LDA was the "exclusive source" through which the Defendants could receive funding for the defense resources they requested, unless they demonstrated a compelling reason for the appointment of a noncontracting resource. But contrary to the district court's conclusions, during oral arguments before this court, both the County[64] and LDA[65] repeatedly stated that LDA does *not* have a contractual obligation to provide defense resources to all indigent defendants. Instead, under the County's interpretation of the contract, LDA has agreed to provide defense resources only to those defendants represented by LDA counsel. Additionally, the County has not alleged that it has contracted with any other entity to provide defense re-

57. The dissent contends that this four-step approach will "take the court into the realm of legislative policymaking." *Infra* ¶ 73. But whether this interpretation will take the court into the inappropriate realm of "legislative policymaking" turns, of course, on the correct assessment of legislative intent. If our interpretation of the wording of the Act is consistent with the intent of the Legislature, it can hardly be said to qualify as legislative policymaking. Thus, our resolution of this question, like the case as a whole, depends on our interpretation of the words used in the Act. Accordingly, rather than rely on statements of individual legislators or policy considerations, we have endeavored to confine our analysis to interpreting the words used in the Act.

58. *See* Utah Code Ann. § 77–32–301. A court may consider a variety of factors in determining whether a defendant is indigent, including a defendant's ability to retain private counsel. *See Burns,* 2000 UT 56, ¶ 32, 4 P.3d 795; *see also* Utah Code Ann. § 77–32–202(3)(b) (Supp.2011).

59. *See* Utah Code Ann § 77–32–301(3) (2008) (stating that a local government is required to provide funding only for "the investigatory resources *necessary* for a complete defense" (emphasis added)).

60. *See id.* §§ 77–32–302(2)(a)–(c), –306.

61. *See Burns,* 2000 UT 56, ¶ 32, 4 P.3d 795.

62. *See* Utah Code Ann § 77–32–306(4).

63. *See id.* § 77–32–301(3) (requiring local governments to provide indigent defendants with "the investigatory resources necessary for a complete defense"); *see also* Utah R.Crim. P. 15(a) (authorizing a district court to order a local government to provide funding to an indigent defendant for a necessary expert witness).

64. Oral Argument at 30:04–19, 37:10–36, *available at* http://www.utcourts.gov/courts/sup/streams/index.cgi?mon=20112.

65. *Id.* at 50:50–51:02, 51:13–42.

sources to indigent defendants represented by private counsel.

¶ 35 As explained above, the plain language of the Act requires a defendant to demonstrate a compelling reason for funding *only* when a local government "has contracted for, or otherwise made arrangements for, the legal defense of [all] indigents, including a competent attorney *and* defense resources."[66] Accordingly, because the County has not contracted to provide defense resources to indigent defendants who are represented by private counsel, the district court should not have required the Defendants to demonstrate a compelling reason for the funding they requested. Instead, the district court should have inquired only into whether the Defendants were indigent and whether the defense resources they requested were necessary for a complete defense. In the event that the district court found that both of these steps were satisfied, it would have been statutorily required to order the County to provide the Defendants with funding for the defense resources they requested.[67]

¶ 36 In concluding that the County may be obligated to provide the Defendants with the funding they have requested, we fully recognize the significant expenses and administrative burden that might be associated with this result. But the Legislature enacted the Compliance Provision and the Hearing Provision specifically to reduce these potential costs. By failing to contract with an entity to provide defense resources to indigent defendants who are represented by private counsel, the County has not established an exclusive source of indigent legal defense, and has therefore failed to avail itself of the cost-saving measures created by the Act. Thus, notwithstanding these potential policy concerns,[68] and instead relying only on the plain language of the Act, we hold that the district court erred in requiring the Defendants to demonstrate a compelling reason for the funding they requested.

## CONCLUSION

¶ 37 We first hold that our conclusion in *Burns*—that local governments are statutorily required to provide an indigent defendant with funding for a necessary defense resource, even when the defendant is represented by private counsel—remains good law. Additionally, we hold that the district court erred in applying the compelling—reason standard to the Defendants' requests. This is because the plain language of the Act requires defendants to demonstrate a compelling reason to receive funding for necessary defense resources *only* if the local government has contracted to provide such resources to all indigent defendants, and in this case the County concedes that it has not so contracted. Based on these conclusions, we reverse the district court's denial of the Defendants' motions for funding and remand these cases for further proceedings consistent with this opinion.

¶ 38 Chief Justice DURHAM, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT'S opinion.

Justice LEE, dissenting:

¶ 39 Today the court affords to indigent defendants the right to demand government-funded defense resources even after declining the legal aid defense established for that

**66.** Utah Code Ann. § 77–32–303 (emphasis added).

**67.** *See id.* § 77–32–301(3); *see also* Utah R.Crim. P. 15(a) (authorizing a district court to order a local government to provide funding to an indigent defendant for a necessary expert witness).

**68.** *See A.C. Fin., Inc. v. Salt Lake Cnty.*, 948 P.2d 771, 778 (Utah 1997) ("[P]olicy considerations are the province of the Legislature, not of this Court."); *Am. Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 191 (Utah 1996) ("While such a policy might be desirable[,] that policy should be enunciated by our [L]egislature and not by this court." (internal quotation marks omitted)); *see also State v. Ireland*, 2006 UT 82, ¶ 21, 150 P.3d 532 ("[S]hould any part of our interpretation bring[ ] about a result contrary to the intention of the Legislature, it is a matter for the Legislature to remedy." (second alteration in original) (internal quotation marks omitted)); *Kincheloe v. Coca-Cola Bottling Co. of Ogden*, 656 P.2d 440, 442 (Utah 1982) ("[A]ny recommended change to ... [statutory] law should be addressed to the [L]egislature and not the court.").

purpose. In so doing, the court discounts recent amendments to the Utah Indigent Defense Act (IDA) that designate legal aid as the "exclusive source" of a public defense. UTAH CODE ANN. § 77–32–306(4) (2008). I respectfully dissent because I read the 2001 IDA amendments to put indigent defendants to a threshold choice—to accept counsel provided by the local government and thereby opt in to the full menu of defense resources offered in conjunction with that counsel, or instead to opt out of the public defense offered by the government and thus retain control over the resources employed through private counsel.

¶ 40 This result follows from the language and structure of the IDA, which seem to me to preclude a defendant from having it both ways. And even if the statutory text left some doubt about a defendant's right to retain his own lawyer while requisitioning separate defense resources, any such ambiguity ought to be resolved in a way that avoids the numerous logistical and legal problems generated by the court's decision today. For me, those intractable problems confirm what the IDA amendments expressly establish, which is that a county that contracts with a legal aid association is entitled to hold it out to indigent defendants as the "exclusive source from which the legal defense may be provided." *Id.* That clause seems to me to require denial of the motions for defense resources in the consolidated cases before the court today, and I accordingly dissent.

## I

¶ 41 As the majority explains, in 2000 this court construed the terms of the IDA then in effect to entitle indigent defendants to necessary defense resources even in cases where they declined public representation in favor of private counsel. *See State v. Burns,* 2000 UT 56, ¶ 32, 4 P.3d 795. The *Burns* decision was premised on the fact that the then-governing IDA authorized a county to "set up a nonprofit legal aid association to provide the minimum required services," but did not "mandate the packaging of indigent assistance" with public representation. *Id.* ¶ 30 (citing UTAH CODE ANN. § 77–32–6 (1990)).

¶ 42 The legislature responded to the *Burns* decision by making extensive amendments to the IDA in 2001. Two of those amendments seem to me to provide what the *Burns* court found missing in the old statute—language mandating "the packaging of indigent assistance" with public representation. First, new section 302 provides that when a legal aid association like Salt Lake Legal Defenders Association (LDA) is under contract to provide the legal defense required by statute ("including defense resources and counsel"), "the court shall assign the legal aid association . . . to defend the indigent *and* provide defense resources." UTAH CODE ANN. § 77–32–302(2)(b) (2008) (emphasis added). Second, new section 306 clarifies that "[w]hen a county or municipality has contracted . . . to provide the legal counsel and defense resources required by this chapter" through a legal aid association, that association is the "exclusive source from which the legal defense may be provided," unless there is a showing of a "compelling reason" to secure a defense resource from another source. *Id.* § 77–32–306(4).

¶ 43 In tandem, these two provisions "mandate the packaging of indigent assistance" with public representation. *Burns,* 2000 UT 56, ¶ 30, 4 P.3d 795. I dissent because I understand these provisions to foreclose the *la carte* requisitioning of defense resources by defendants who retain private counsel and because I find the basis for the majority's contrary construction unpersuasive.

## A

¶ 44 Section 302's conjunctive "and" is significant. It clarifies that when a legal aid association is the county's chosen method of providing a legal defense to an indigent, the association is to provide both the defense *and* associated defense resources. The conjunctive "and" provides the bundling requirement that was missing in the statute construed in *Burns.*

¶ 45 The majority's construction overrides this important term. In upholding defendants' requests for unbundled defense resources, the majority authorizes private counsel "to defend the indigent" while requiring the County to fund "defense resources."

That strikes me as incompatible with the statutory text, which unambiguously states that district courts "shall" assign the legal aid association to provide both a defense and defense resources.[1]

¶ 46 The majority's approach also fails to give effect to the "exclusive source" proviso in new section 306. This proviso reaffirms the bundling requirement articulated in the conjunctive language of section 302 and deemed missing in *Burns*. If a defendant with private counsel is entitled to funding for a non-LDA private investigator or expert witness, the legal aid association cannot be said to be the "exclusive source" for the provision of indigent legal defense in the county. Instead, after today's decision, the legal defense in such cases will be provided through a dual system in which one set of indigents will be represented by LDA and another will be represented under a hybrid regime in which private counsel will be at the helm but the county will have to provide funding for defense resources through non-LDA providers.

¶ 47 This dual system is completely foreign to the IDA. The statute recognizes only three mechanisms for providing a legal defense to indigent defendants: a "[l]egal defender's office," which is a "department of county government created and authorized by the county legislative body to provide legal representation," Utah Code Ann. § 77–32–201(6) (Supp.2011); a "[l]egal aid association," defined as "a nonprofit defense association that provides counsel and defense resources," *id.* § 77–32–201(5); and attorneys or providers under contract with the local government entity. *See id.* § 77–32–302(2) (identifying these three mechanisms). When the government adopts one of these mechanisms, the IDA requires the court to assign the chosen entity to "defend indigent defen-

dants within the county and provide defense resources," *id.* § 77–32–302(2)(a), and designates that entity as the "exclusive source from which the legal defense may be provided," *id.* § 77–32–306(4).

¶ 48 By offering a choice among these three mechanisms (legal defender's office, legal aid association, or individual contracts), the legislature apparently aimed to preserve workable defense options for both large and small counties. A defender's office or legal aid association is costly and relatively permanent, so these mechanisms make economic sense only in large counties where the volume of criminal defense work is sufficient to justify this expense. In such counties, however, an established office or aid association is more efficient than relying on individual contracts, since an office or aid association can provide a defense at a lower hourly cost by offering full-time work to its employees. Yet smaller counties cannot reasonably offer full-time work given their lower volume of criminal cases, so they are left to provide a defense to indigents at somewhat higher hourly cost through individual contracts or retainer agreements.

¶ 49 Salt Lake County understandably opted for the legal aid mechanism available under the IDA. This method makes sense for a large county where a full-time staff is justified and an aid association can provide an efficient, coordinated defense. Yet the court today forecloses this option as the exclusive source of indigent defense going forward, requiring that a county's legal aid association must be paired with contracted defense resources for any defendant who elects to retain private counsel.

¶ 50 In so doing, the majority eliminates the efficiencies inherent in the legal aid mechanism offered by the legislature and

---

1. In response to this argument, the majority suggests that the quoted statutory language may not foreclose the possibility that a defendant assigned both counsel and defense resources might be able to "waiv[e]" the former and "elect[ ]" only the latter. *Supra* ¶ 26 n. 42. But that is the very question presented by this case, and the majority cannot find support for the affirmative answer that it adopts in the conjunctive language of section 302. If the legislature had intended to allow a defendant to waive assigned counsel while retaining collateral defense resources, surely it would have done more than simply require the court to assign both counsel and resources together. And even if the waiver question were left open by section 302, the issue is closed by the "exclusive source" proviso in section 306. A defendant who waives government counsel while retaining public defense resources can hardly be said to be receiving an indigent defense from an exclusive source.

adopted by Salt Lake County. The court faults the County for failing to "avail itself of the cost-saving measures" provided by statute, *supra* ¶ 36, but in my view the County did just that in electing the legal aid mechanism offered under the IDA. A legal aid association's principal advantages are in its ability to pool its full-time resources in the provision of a complete, coordinated, and well-managed defense. If a county that chooses that coordinated mechanism is required to supplement it with individual contracts for those who retain private counsel, it will lose out on the efficiencies associated with a legal aid association.

¶ 51 However, my objection to the court's approach is not the "policy concern[ ]" associated with the costs and inefficiencies generated by its decision. *Supra* ¶ 36. It is that the legislature acted to avoid these problems and the court has overridden its chosen method of doing so. In effect, the court precludes a county from implementing the legal aid association (with its obvious and intended efficiencies) as the "exclusive source" for the defense of indigents, implementing instead a dual system of legal aid defense *plus* individual contracts for separate defense resources. That approach is incompatible with the language and structure of the IDA, which preserve for counties the right to choose to provide indigents a defense *either* through a legal aid association under Utah Code section 77–32–302(2)(b) *or* by "contract[ing] to provide" the defense through "individual defense resources" under section 302(2)(c). The court's approach accordingly finds no support in the structure or language of the statute, and I reject it on that basis (and not because of a mere policy concern about expenses).

**B**

¶ 52 I am unpersuaded by the majority's contrary contentions. First, it is certainly true that "the revised Act requires that defense resources be provided to 'each indigent.'" *Supra* ¶ 26 (quoting UTAH CODE ANN. § 77–32–302(1)(a)). But that merely begs the question of the *method* the government is required to employ in defending "each indigent." That question is answered in the amended IDA in the requirement that the district court order the legal aid association to provide the defense and necessary defense resources, and is reaffirmed in the proviso that the association is the "exclusive source" of the indigent's defense. Second, the majority wrongly emphasizes a provision of the IDA that in its view "expressly contemplates the provision of defense resources to indigent defendants separate and apart from the provision of counsel." *Supra* ¶ 26. A close grammatical and logical examination of the provision in question leads to the opposite conclusion and reinforces the notion that the mechanism selected by the government for indigent defense shall be the "exclusive source" of that defense. Third, as for the statute's legislative history, the statements cited by the majority say nothing of any relevance to the question before the court today. And the majority improperly discounts a floor statement that *is* relevant and confirms the legislature's intent to overrule *Burns*.

**1**

¶ 53 The majority opinion hinges principally on the repeated assertion that a government entity must provide for the complete defense of *each, every,* and *all* indigent defendant(s). *See supra* ¶¶ 3, 24, 26, 33–35, 37. That uncontroversial question has been resolved and is not before us. No one doubts that every indigent is entitled to a complete defense. The real question presented is whether that defense is to be provided exclusively through the legal aid association adopted by the government or whether the defendant is entitled to fashion his own *la carte* defense at government expense. The 2001 amendments to the IDA answer that question unambiguously, and those provisions cannot be ignored on the basis of a truism about the right of "each indigent" to a defense.

¶ 54 The majority's attempt to explain away the "exclusive source" proviso is similarly circular. It is inaccurate to say that the County has failed "to provide defense resources to all indigent defendants" through its contract with LDA. *Supra* ¶ 34. Rather, the County has agreed to provide such re-

sources to all indigents so long as their representation conforms to the terms and conditions set forth by contract and endorsed by statute.

¶ 55 Those terms and conditions properly require bundling of the legal defense and associated defense resources. In the County's contract with LDA, LDA agrees to provide, for an annual lump sum paid by the County, both "legal counsel and investigators and support services to indigent defendants" in the County. In context, there is no doubt that LDA's obligation is to represent all qualifying indigent defendants and that its representation will bundle both counsel and support services. The contract calls for LDA's provision of all "legal advice and representation at all stages of the proceedings, to indigent persons entitled thereto . . . pursuant to the provisions of the Utah Code Ann. § 77–32–301." (Section 301 sets forth the minimum standards for defense of an indigent, including the provision of counsel, investigatory resources, and a first appeal of right.)

¶ 56 Thus, despite the majority's contrary assertions, the County's contract with LDA *does* provide for comprehensive representation of "all indigent defendants."[2] What it does not do is give indigent defendants unfettered discretion as to the *method* of their representation. Yet the majority identifies nothing in the IDA or elsewhere that guarantees such a right, and I am aware of no basis for such a sweeping entitlement. Instead, the IDA identifies prescribed, "exclusive source[s]" for a public defense, and that limited right should not be expanded on the basis of a defendant's (or the court's) preference for something else.

¶ 57 When a legal aid association provides defense resources to an indigent, it always

does so on terms and conditions condoned by statute. Such terms and conditions necessarily restrict a defendant's discretion to select the defense resources that suit his personal preferences. If a defendant demanded that LDA retain the defendant's cousin Vinny as a private investigator, for example, LDA would properly respond by indicating that LDA screens and hires its own investigators and the defendant has no right to requisition his own preferred resource. And the defendant would be stuck (absent a "compelling reason") with LDA's investigator and not entitled to his cousin Vinny—notwithstanding the right of "all indigent defendants" to a comprehensive defense. That defendant, like the defendants in the cases before the court today, has a right to a defense that conforms to the standards set forth in the IDA, not to his own personal preferences.

¶ 58 Those standards limit the IDA-provided defense to the contracted legal aid association as the "exclusive source" for the defense. A defendant who insists on defense resources from another source is effectively opting out of a publicly funded defense. That does not mean that he has been denied the defense that all indigents are entitled to. It simply means that he has opted out of the defense mechanism provided by the county under the IDA.

2

¶ 59 The majority also relies on a provision of section 302 that states that a defendant may " 'request[ ] counsel *or* defense resources, *or* both.' " *Supra* ¶ 26 (quoting Utah Code Ann. § 77–32–302(1)(a) (2008)). In the majority's view, the disjunctive "or" indicates that the IDA "expressly contemplates the provision of defense resources to indigent

---

2. Neither LDA nor the County stipulated otherwise. The County simply conceded that there were no "contracting defense resources" available to defendants "absent LDA appointment." Oral Argument at 37:10–36, *available at* http://www.utcourts.gov/courts/sup/streams/index.cgi?mon=20112. LDA's stipulation was to the same effect. It simply indicated that its contract "requires that [it] be appointed to advise and represent and within the umbrella of that [it] provide[s] defense resources." *Id.* at 50:50–51:10. Thus, it is an oversimplification to suggest that the parties "repeatedly stated that LDA does *not*

have a contractual obligation to provide defense resources to all indigent defendants." *Supra* ¶ 34. The parties acknowledged a responsibility to serve all indigents. They just read the statute to let them serve all indigents through a single, exclusive source.

The precise terms of these stipulations are significant. They clarify that there is a contract between LDA and the County for the provision of "defense resources to *all* indigent defendants," *supra* ¶ 33, so long as defendants comply with the terms and conditions of representation adopted by LDA and condoned by the IDA.

defendants *separate and apart* from the provision of counsel." *Supra* ¶ 26 (emphasis added). That construction fails as a matter of logic and grammar.

¶ 60 Section 302(1)(a) is a threshold provision identifying the kinds of resource requests that trigger the operative provisions of the statute. Under this provision, a defendant's request for any or all defense resources triggers a right to a government-provided defense upon a finding of indigency. But rather than "expressly contemplat[ing] the provision of defense resources to indigent defendants separate and apart from the provision of counsel," as the majority contends, *supra* ¶ 26, this provision confirms that the IDA requires that these elements of a defense be provided together or not at all.

¶ 61 This understanding is confirmed by a grammatical parsing of the governing language. The revised assignment provision states that "[l]egal counsel shall be assigned to represent each indigent *and* the indigent shall also be provided access to defense resources necessary for an effective defense ... *if:* (a) the indigent requests counsel or defense resources, or both." UTAH CODE ANN. § 77–32–302(1) (emphases added). This provision establishes a cause-and-effect relationship between a conditional, subordinate clause with three sub-parts (section 302(1)(a)) and a main clause (section 302(1)).[3] Under these provisions, the main clause right to counsel and defense resources is triggered by any of three separate conditions in the subordinate clause—(a) a request for counsel, or (b) a request for defense resources, or (c) a request for both counsel and defense resources. The relationship between these two sections can be expressed formally as follows:

|  | | |
|---|---|---|
| | *(a)* the indigent requests counsel, *or* | |
| *If* | *(b)* the indigent requests defense resources, *or* | *(then)* *(x)* legal counsel shall be assigned, *and* |
| | *(c)* the indigent requests both counsel and defense resources | *(y)* defense resources shall be provided |

**3.** *See* RODNEY HUDDLESTON & GEOFFREY K. PULLUM, THE CAMBRIDGE GRAMMAR OF THE ENGLISH LANGUAGE 736–37 (2002) (discussing conditional constructions). In traditional logic, the subordinate clause was referred to as the *protasis*, while the main clause was referred to as the *apodosis. Id.* at 736 n. 23. As its name suggests, the *protasis* (or subordinate clause) often comes first, but this is not always the case, and listing it second does not alter the

¶ 62 Because the terms of section 302(1)(a) are disjunctive, each type of request serves as an independent trigger for the provisions of section 302(1). In contrast, the provisions of section 302(1) are conjunctive, a relationship that is highlighted by the complementary use of the mandatory *shall* for both the provision of counsel and the provision of defense resources. Thus, any of the requests contemplated in section 302(1)(a) automatically triggers the mandatory provision of *both* counsel *and* defense resources.

¶ 63 A similar paradigm is found in section 302(1)(b), which provides that if "the court ... orders counsel, defense resources, or both and the defendant does not affirmatively waive ... the opportunity to be represented *and* provided defense resources," then, according to section 302(1), "[l]egal counsel *shall* be assigned," *and* "the indigent *shall also* be provided defense resources." *Id.* § 77–32–302(1)(b) (emphases added). Here, as in section 302(1)(a), an order of one triggers the other, and nothing in the statute suggests that counties are required to provide defense resources separately. It is thus of no help to the majority's position to observe that the statute does not expressly prohibit the defendant from "waiving his right to government-funded counsel and electing to utilize only government-funded defense resources." *Supra* ¶ 26 n. 42. The statute contains no affirmative obligation on the part of the county to provide counsel and defense resources separately and makes no provision for what the county must do in the event that the defendant attempts to waive one or the other. Indeed, the only type of waiver that the statute contemplates is the waiver of counsel *and* defense resources jointly. UTAH CODE ANN. § 77–32–302(1)(b).[4] Consequently, the "right" of the defendant to waive one or the other is a judicial and not a

grammatical relationship between the two clauses. *Id.* at 739.

**4.** It is not correct to say, as the majority does, that section 302(1)(b) "expressly states that a court *may* assign 'counsel, defense resources, or both.' " *Supra* ¶¶ 26 & 28 n. 52 (emphasis added). The statute does not tell us what the court *may* do; it tells us what the counties must do *if* a judge orders "counsel, defenses resources, or

legislative innovation. And it is the majority's creation of this right, and not the analysis above, that reads a substantive provision into the statute. *Supra* ¶ 26 n. 42. This section accordingly provides grammatical and logical support for the conclusion that LDA is the "exclusive source" of all elements of the defense.[5]

3

¶ 64 The majority also deems its construction to be confirmed by statements in the IDA's legislative history, but the statements it relies on are irrelevant. I see no reason to credit Senator Hillyard's personal characterization of the operative effect of the IDA-that the statute "acknowledge[s]" the "right" of an indigent who hires his own lawyer to have a court-appointed expert. RECORDING OF UTAH SENATE FLOOR DEBATES, S.B. 154, 54TH LEG., GEN. SESS. (Feb. 12–13, 2001) (statement of Sen. Hillyard), *available at* http://le.utah.gov/asp/audio/index.asp?Sess=2001GS&Day=0&Bill=SB0154&House=S. The majority omits important context from Senator Hillyard's statement, in which he indicates that the "right" that he acknowledged arises only in circumstances where the indigent defendant "take[s] [the expert] off the panel

that the court-appointed attorneys use all the time." *Id.* As this context makes clear, Senator Hillyard's statement makes no reference to any enacted provision of the IDA nor to any attempt to elaborate on the meaning of its terms. It is instead a rank assertion of a single legislator's subjective intent. And that intent bears no relation to—and is affirmatively undermined by—the express terms of the statute, which say nothing about any "panel" of experts that an indigent defendant can select from.[6] This sort of legislative history should not be entitled to any weight, as it is aimed not at elucidating the meaning of the statutory text but at contradicting it.[7]

¶ 65 It is one thing to consult the legislative history to identify "the prevailing understanding of the ambiguous words of the statute at the time of its enactment." *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 112, 266 P.3d 702 (Lee, J., concurring). But non-statutory statements of legislative intent should never be considered when they are aimed at supplanting the language enacted into law.[8] It is the statutory text, after all, that was voted on by the legislature and signed into law by the governor. If we jettison that text in the face of an extra-statutory

---

both." UTAH CODE ANN. § 77–32–302(1)(b). As explained above, the only thing that the counties are expressly required to do by the terms of this section is to provide counsel and defense resources jointly if either is requested.

**5.** The majority supposes additional support for its view in a structural argument credited in *Burns*-that "the separate and discrete listing of" counsel and defense resources in Utah Code section 77–32–301 "strongly indicates that the Legislature intended for 'the right to counsel [to] stand[] separate and distinct from the right to the investigatory [resources].' " *Supra* ¶ 26 (alterations in original) (quoting *Burns*, 2000 UT 56, ¶ 28, 4 P.3d 795). I cannot see how the separate listing of rights that are within an indigent defendant's total defense package in any way suggests that those rights may be demanded separately, however. Those rights had to be listed somehow-whether in contiguous subsections of a statute, or within a single paragraph separated by commas (which could perhaps itself be characterized as a "separate and distinct" listing)—but such separate listing has no bearing on the question whether the revised IDA requires those separately listed rights to be employed as a total defense package.

**6.** Indeed, LDA clarified at oral argument that there is no such "panel," and thus that Senator

Hillyard's characterization was reflective of neither the text of the IDA amendments nor of practical reality. Oral Argument at 52:15–53:54, *available at* http://www.utcourts.gov/courts/sup/streams/index.cgi?mon=20112.

**7.** *See Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶ 10, 175 P.3d 560 (noting concerns of "judicial mischief" inherent in the process of employing legislative history or public policy, in that it may be "easily shaped to satisfy the preferences of a judge rather than the will of the people or the intentions of the legislature").

**8.** *See United States v. Albertini*, 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (" '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from [the statutory] language." (quoting *Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984))); *Yang v. Cal. Dep't of Soc. Servs.*, 183 F.3d 953, 960 (9th Cir.1999) ("[A] legislator's remarks cannot override the plain meaning of the statute...."); *Marsh v. Skinner*, 922 F.2d 112, 116 (2d Cir.1990) ("[A] statement, by a single legislator, is not sufficient to override the clear language of [a statute].").

statement of a legislator's personal intent, we circumvent the constitutional procedures for legislative enactments and substitute the preferences of individual legislators for the statutory text. That is inappropriate, as those preferences have not run the constitutional gauntlet for legislation and thus merit no such dignity.[9]

¶ 66 The majority gives just such dignity to Senator Hillyard's statement. His personal views of the effect of the IDA amendments are not legislation, despite the fact that they were articulated by a legislator. Legislators make law only by expressing their views in a bill that becomes a statute upon bicameral enactment and presentment to the executive. If Senator Hillyard sought to enact a right of an indigent defendant who chooses a private lawyer over LDA to pick an expert "off [a] panel that the court appointed attorneys use all the time," it was incumbent on him to do more than speak of it in a floor statement in the Senate. Because he failed to do so and the right he spoke of has no plausible mooring in the statute, we should not credit it as "contradict[ing] the County's position" or "strongly suggest[ing]" the right the court establishes today. *Supra* ¶ 27.

¶ 67 In all likelihood, Senator Hillyard's reference to a "panel" of experts was a description of a section of the statute that is not before the court today. In context, his reference to taking an expert from a "panel" of experts that the county has "a contract with ... limiting what they can charge on [ ] fees and what the county has to pay for" seems to reference section 77–32–302(2)(c). This section deals with the circumstance in which the county chooses to provide indigent representation not by establishing a legal defenders office (discussed in section 302(2)(a)) or by contracting with a legal aid association (discussed in section 302(2)(b)), but by "contract[ing] to provide" the defense and defense resources "through individual attorneys, individual defense resources, or associations providing defense resources." UTAH CODE ANN. § 77–32–302(2)(c). In that context, perhaps it could be said that an indigent defendant could "take [an expert] off the panel that the court-appointed attorneys use all the time" under a contract "limiting what they can charge on the fees and what the county has to pay."

¶ 68 And in that circumstance, perhaps Senator Hillyard would be correct in asserting that "to use an expert" a defendant would simply have "to take it off the panel" agreed to by the county in its contract with defense resources. But that approach is manifestly not available in the legal aid association scenario at issue in this case. In that circumstance, the statute itself makes clear that the legal aid association is the "exclusive source from which the defense may be provided," *id.* § 77–32–306(4), and there is no expert "panel" available outside LDA for a defendant to choose from. Thus, Senator Hillyard could not have been speaking of the legal aid association scenario in his Senate floor statement, and the comments credited by the majority are simply irrelevant to the question presented to us today.[10]

¶ 69 Although the floor statements relied on by the majority are immaterial, there is nothing about the meaning of the words of the statute and thus have no relevance either in supporting our own interpretation or in rejecting a contrary one.

---

9. In open recognition of these problems, the majority disclaims any intent to use this legislative history affirmatively "to bolster [its] interpretation of the text of the Act," insisting "[i]nstead" that it deems it relevant *"only* to demonstrate that the County's argument—that the 2001 amendments were 'clearly intended' to overturn *Burns*—lacks merit." *Supra* ¶ 27 n. 48. I struggle to see the difference, since at least one of the court's affirmative conclusions is that the statute does not overrule *Burns*. If the cited legislative history is part of what persuades the majority to reject the County's assertion that the 2001 amendments overrule *Burns*, then that same legislative history must likewise be an element of the statutory construction adopted by the court. I object to the court's resort to that history for either purpose, as the cited statements tell us

10. The same can be said of Senator Gladwell's statement, also quoted by the majority. *Supra* ¶ 28. In speaking of the circumstance in which a county "has contracted for ... defense resources" and acknowledging that the court must "require that the defense resources be provided by that contract merely as a way of keeping costs in check," Gladwell seemed to be speaking of the private contract scenario addressed in section 302(2)(c), not the legal aid association scenario addressed in section 302(2)(b) and at issue in this case.

some discussion in the legislative history that speaks to the meaning of the statutory text that is at issue here. The relevant discussion is a statement by Representative Curtis of the import of the IDA provision that authorizes a county to "contract[ ] with a nonprofit legal aid or similar association that provides both counsel and defense resources." RE-CORDING OF HOUSE FLOOR DEBATES, S.B. 154, 54TH LEG., GEN. SESS. (Feb. 26, 2001) (statement of Rep. Curtis), *available at* http://le.utah.gov/asp/audio/index.asp?Sess=2001GS&Day=0&Bill=SB0154&House=H. After explaining that the 2001 amendments "deal[ ] with the recent Supreme Court decision that allows defendants to utilize publicly funded expert witnesses and investigators, even though the defendant may be financially able to retain private counsel," Representative Curtis explained that the amended language of the IDA "allows the cities and counties to control the costs of those indigent defense services by providing expert witnesses and investigators in one of three ways." *Id.* Turning to the legal aid association scenario at issue in this case, Representative Curtis noted that the amended statute provides what was missing in *Burns:* a clarification that "the defendant must use the legal aid association for the *total defense package* and defense resources, unless the defendant can demonstrate a compelling reason for going outside the system." *Id.* (emphasis added). Significantly, Curtis then explained that this "exclusive source" proviso indicates "the legislature's intent to make the legal defenders association the *sole source* for defense [inaudible], unless the court finds a compelling reason otherwise." *Id.* (emphasis added).[11]

¶ 70 Representative Curtis's statement contradicts the majority's construction of the IDA. *Burns* rested on the legislature's failure to "mandate the packaging of indigent assistance with LDA representation," 2000 UT 56, ¶ 30, 4 P.3d 795, and the majority deems that still missing in the 2001 amendments. But in case of any doubt about the import of the "exclusive source" proviso in the statute, Representative Curtis clarified that in a county that has contracted with a legal aid association, "the defendant must use the legal aid association for the *total defense package*." Thus, the only relevant legislative history confirms what the statutory language makes quite clear—that the 2001 amendments to the IDA overruled *Burns* by subjecting indigent defendants to a threshold choice whether to accept the "total defense package" provided by a legal aid association, foreclosing the *a la carte* requisitioning of resources endorsed by the majority today.[12]

## II

¶ 71 When choosing between two alternative constructions of ambiguous language, we may "look to the consequences of those readings to determine the meaning to be given

---

11. The majority seeks to paint Representative Curtis's statement with the same brush I have used for Senators Hillyard and Gladwell, asserting that the Curtis statement is entitled to no weight because it "contradict[s] the plain language of the Act." *Supra* ¶ 28 n. 52. For me, however, there is an important difference between the Curtis statement on the one hand and the Hillyard and Gladwell statements on the other: Only the former speaks to and elaborates on the meaning of the statutory language that is at issue here (in particular, the "exclusive source" proviso in section 306), and thus only that statement gives guidance as to the meaning of its terms. Senators Hillyard and Gladwell offer views that are completely foreign to the language and structure of the statute (in suggesting a right to take an expert off a "panel," for example), and their views are thus problematic in ways that Representative Curtis's statement is not.

12. As the majority notes, the legislature could have adopted language that more explicitly over-

ruled *Burns*. *Supra* ¶ 29. But that tells us next to nothing. The formulaic notion that "if the legislature had meant to say 'x,' it could have said so more explicitly ... almost never advances the ball analytically." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 66 n. 24, 267 P.3d 863 (Lee, J., dissenting). After all, "[i]n any case that warrants our careful attention, it will most always be true that the legislature could have spoken more precisely." *Id.* Thus, I grant that the legislature could have spoken more precisely in overruling *Burns*. The fact that it didn't necessitates our stepping in to resolve this case. And the question in this case is not whether the legislature spoke with the crystal clarity expected from the standpoint of 20/20 hindsight, but what it meant when it spoke in the imperfect terms typically used by most of us imperfect people. I find ample basis in the statute for concluding that the legislature overruled *Burns*, and it seems to me to add nothing of analytical value "to imagine an easier case in which the legislature spoke more clearly." *Id.*

the statute." *State v. Redd*, 1999 UT 108, ¶ 12, 992 P.2d 986. Specifically, where one interpretation produces problems that are not easily resolved under the statute, we may reject it in favor of an alternative approach that avoids these concerns. *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶¶ 70–73, 267 P.3d 863 (Lee, J., dissenting).

¶ 72 Such concerns may arise, for example, where one construction of a statute introduces problems that require the court to become a policymaker instead of an interpreter.[13] When presented with alternative interpretations of a statutory scheme, we should choose the one that involves the judiciary least in the enterprise of legislative policymaking.[14] We should presume that the legislature intended to preserve the respective legislative and judicial roles, with the legislature making policy and the courts construing and applying that policy to cases that come before them.[15] If one of two interpretations of a statute conflates those roles, it should accordingly be rejected as contrary to legislative intent.

¶ 73 The majority's interpretation of the IDA fails on that basis. For reasons elaborated below, the majority's approach takes the court into the realm of legislative policymaking, while my construction keeps us in the proper sphere of judicial interpretation. That is a basis for rejecting the majority's view in favor of mine even if the statute were open to both approaches.

¶ 74 The problems with the majority's approach arise from the lack of a "gatekeeping" mechanism for defense resource requests when LDA is not involved in the defense. The absence of such a mechanism generates a series of problems that will require the court to make its own policy judgments because these problems are not addressed by the language of the statute.

¶ 75 When a defendant is required to seek all defense resources from a single "exclusive source" such as LDA, the legal aid lawyer assigned to the case performs a gatekeeping function in utilizing only those resources that are reasonably necessary. LDA is charged by statute and appointed by the court to "defend the indigent and provide defense resources," which include any necessary "competent investigator, expert witness, or other appropriate means necessary[ ] for an effective defense of an indigent." UTAH CODE ANN. § 77–32–201(3) (Supp.2011). Ordinarily, it is up to LDA to make an informed decision as to what resources are reasonably necessary, weighing the costs and benefits of any particular resource.[16] If the indigent

13. *Cf. Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329–30, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (arguing that because "our constitutional mandate and institutional competence are limited" we ought to "restrain ourselves from rewriting" the law or engaging in "quintessentially legislative work" that calls for "a far more serious invasion of the legislative domain than we ought to undertake" (alterations, citations, and internal quotation marks omitted)).

14. *See Buckley v. Valeo*, 424 U.S. 1, 37 n. 43, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (preferring an interpretation of a statute that is "not only consistent with the statute and the legislative history but is also necessary to avoid ... administrative chaos").

15. *See State v. Herrera*, 895 P.2d 359, 362 (Utah 1995) ("[D]elicate balancing of public policy is better accomplished in the legislature than in the courts."); *Bastian v. King*, 661 P.2d 953, 956 (Utah 1983) ("It is the power and responsibility of the Legislature to enact laws to promote the public health, safety, morals and general welfare of society, and this Court will not substitute our

judgment for that of the Legislature with respect to what best serves the public interest. The adjustment and accommodation of conflicting interests, such as are involved in this case, are for the Legislature to resolve, irrespective of the rules applied by other states." (citations omitted)); *Redwood Gym v. Salt Lake Cnty. Comm'n*, 624 P.2d 1138, 1143 (Utah 1981) ("It is not the function of this Court to evaluate the wisdom or practical necessity of legislative enactments."); *see also* UTAH CONST. art. V, § 1 ("The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and *no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others*, except in the cases herein expressly directed or permitted." (emphasis added)).

16. This reality runs counter to the majority's "four-step" reading of the IDA, which requires in the second step that the court "must determine" in every case "whether the defense resources requested by the defendant are *necessary* for a complete defense." *Supra* ¶ 33 (emphasis in original). The assertion that the court must al-

defendant suggests the need for a ballistics expert but LDA deems it unnecessary, that is generally the end of the matter, as LDA is the "exclusive source" for the legal defense and thus has the final say on the nature and scope of that defense. That is not to say that LDA's decision is unreviewable. The statute leaves room for appointment of "noncontracting ... defense resources" on proof of a "compelling reason." *Id.* § 77–32–306(4) (2008). But such an appointment is the exception to the rule, which generally leaves it up to LDA to decide whether and to what extent to use investigators, experts, and other resources.

¶ 76 As LDA explained in its *amicus* brief to the court, requests for defense resources are subject to a careful screening process within LDA. When an LDA attorney perceives the need for a particular expert witness, for example, the attorney submits a request to the director, explaining why the expert is needed and how his testimony will affect the case. No expert may be retained until the director approves. The director's approval is based on an evaluation of the marginal cost and benefit of the particular expert. And usually the director's authorization will be up to a certain dollar ceiling, to be revisited if and when there is a perceived need for an increase.

¶ 77 The use of LDA investigation resources is also subject to an internal screening mechanism. LDA employs investigators on its staff, and attorney requests for investigation resources are channeled through the investigator assigned to a particular attorney. Each investigator prioritizes the requests he receives based on the relative importance of those requests, taking into account the seriousness of the case, the timing of upcoming hearings or trial, and other significant factors. And again,

any disagreements within LDA on those issues are subject to review and resolution by the director, who oversees both the lawyers and the investigators within the association.

¶ 78 None of this screening is logistically possible in the hybrid scenario endorsed by the majority today. Where the indigent defendant is represented by private counsel, there is no LDA lawyer with an educated understanding of the case informed by attorney-client-privileged communication with the defendant. The only person with that crucial understanding of the case will be the defendant's private lawyer. Therein lies the problem. Unlike LDA counsel, who has an insider's understanding of the costs of and logistical limitations on LDA defense resources, the private lawyer sees only the benefit side of the equation. Private counsel will accordingly be prone to over-demand defense resources from the County. And the County will be in no position to give meaningful pushback, as it understands the cost of the requested defense resource but cannot meaningfully assess its benefit.

¶ 79 The predictable result will be the over-provision of defense resources to indigents with private counsel. Because the County will lack the knowledge or infrastructure necessary to resist private counsel's request for investigative or expert assistance, as a practical matter the County may be left to provide resources beyond those "necessary for a complete defense." *Id.* § 77–32–301(3). Extensive demands for experts or investigators might be rejected out of hand by LDA, but the County may be forced to accede given its lack of a privileged understanding of the case.[17]

¶ 80 It is no answer to suggest that the County could deal with this problem by es-

ways be involved in determining what resources are necessary finds no support in any statutory text, has no place in standard practice in indigent defense cases (at least where a nonprofit legal aid association is providing the defense), and will generate a substantial increase in the workload of the district courts of this state.

17. The majority proposes to deal with this problem by requiring the court to "determine whether the defense resources requested by the

defendant are *necessary* for a complete defense." *Supra* ¶ 33. But of course the court can make no such determination without the benefit of adversarial input from the parties. The necessity determination called for by the court only reiterates the dilemma that the court creates for the County—either give a pass through to resource requests made by indigents with private counsel or establish a review mechanism that unnecessarily duplicates the LDA infrastructure.

tablishing some sort of indigent defense review board, with oversight by "shadow" legal counsel who can attempt to review and evaluate the merits of a resource request by a defendant's private attorney. Such a response would involve mechanisms and decisions that extend well beyond those contemplated by the IDA. If the County has to appoint shadow counsel to evaluate resource requests, it will be even more obvious that LDA is not the "exclusive source" for the indigent's defense.

¶ 81 The problem is illustrated by the motions that led to the appeals in the consolidated cases before the court. In the *Jeffs* case, for example, the defendant moved for (a) appointment of a private investigator to interview police witnesses, neighbors who may have been eyewitnesses, and medical personnel who saw and treated defendant; (b) a ballistics expert who may be able to offer expertise of relevance to defendant's state of mind in firing his weapon; and (c) medical experts to testify that defendant had diminished capacity caused by certain medications that he was taking. In advancing this motion, Jeffs asserted that each of those resources was necessary to an effective defense. Yet the County is in no position to evaluate the relative importance of these resources, much less to weigh their marginal costs and benefits. Without some involvement in the case by counsel retained by the County, the County may well be stuck taking Jeffs' counsel's word for it, acceding to these resource requests without any informed basis for evaluating whether they are really necessary. And this may well be just the beginning of Jeffs' demand on the County's defense resources, as Jeffs' motion makes not just an extensive demand on investigatory and expert resources but also suggests that "as the

investigation progresses, the need for such ... expert[s] will increase." [18] The resulting reality could not be more incompatible with the IDA regime, with the defense coming from multiple sources and requests for resources being provided without any effective screen for their necessity.

¶ 82 The prospect of the County's appointment of shadow counsel to review these requests is equally problematic. Introducing shadow counsel would open a Pandora's Box of legal and ethical quandaries, such as the nature and extent of shadow counsel's ethical duties, how to resolve disputes between County lawyers and private counsel, and what to do if the client is uncomfortable establishing an attorney-client relationship with the County attorney. None of these questions is answered by statute, so the hybrid regime endorsed today inevitably will require the courts to sort these problems out in future cases. As we head down this uncharted path, we will be left to legislate by the lights of our own judicial policy preferences, as the IDA itself says nothing at all about these problems.

¶ 83 As we resolve these and other questions generated by today's precedent, we will necessarily be fabricating judicial standards that lack any mooring in any statutory language, as the hybrid system endorsed today is nowhere provided for by statute. That process will make the essential defect of today's decision increasingly apparent: The hybrid system of representation endorsed by our court is a judicial creation, not a mechanism contemplated by the legislature. We need not start down this path to judicial legislation. I would decline to do so on the ground that the 2001 amendments to the IDA provide that LDA is the "exclusive source" of an indigent's legal defense.

---

18. Unfortunately, I see no reason for the exploitation of county resources to end with experts and private investigators. The defense resources that an indigent defendant is entitled to include legal counsel and any "appropriate means necessary[ ] for an effective defense of an indigent." UTAH CODE ANN. § 77–32–201(3) (Supp.2011). The majority's approach therefore would presumably allow a defendant's private counsel to demand that the County provide secretarial support, a computer and printer, and even junior counsel support for the defense. *See, e.g., State v. Jones*, 707 So.2d 975, 978–79 (La.1998) (allowing appointment of public co-counsel to assist private counsel in the defense of death-eligible indigent defendants). This cannot be what the legislature had in mind when it amended the IDA to limit an indigent to a legal aid association as the "exclusive source" of his defense.

### III

¶ 84 As the defendants in the consolidated cases before the court have indicated, the constitutional right to counsel encompasses the prerogative of choosing counsel of one's choice and of receiving resources necessary to an adequate defense. Such rights are qualified ones, however, affected by the "avenues which [the defendant] chose not to follow as well as those he now seeks to widen." *United States v. MacCollom,* 426 U.S. 317, 326, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976). When a defendant elects an avenue that steers away from the public representation provided by the government, he has received the private counsel of his choice and has no constitutional or statutory right to defense resources from a secondary source backed by government funding.

¶ 85 The "right to choose one's own counsel is circumscribed in several important respects," most importantly in the fact that an indigent defendant cannot "insist on representation by an attorney he cannot afford." *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Thus, a defendant has every right to decline the counsel the government offers in favor of the one he prefers, but in so doing he loses the right to a publicly funded defense. *Id.*[19]

¶ 86 A defendant who opts out of public representation also loses the right to government-funded defense resources. That result is prescribed by statute in Utah, for all of the reasons explained in the foregoing sections of this opinion. And despite vague assertions to the contrary by the appellant-defendants, that result is entirely consistent with the requirements of the United States Constitution. An indigent defendant has a right to "the basic tools of an adequate defense,"

*Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), not "the legal arsenal that may be privately retained by a criminal defendant."[20] Thus, the constitutional question before us is whether the defense available to indigents through the "exclusive source" of LDA is "adequate." That question has a clear answer. No one has suggested that the panoply of resources provided by LDA falls short of the fundamental requirement of "the basic tools of an adequate defense," and without that showing there is no ground for establishing a new constitutional right to unbundled defense resources. A defendant who opts out of LDA representation has also opted out of LDA defense resources, and nothing in the Constitution requires a different result.

¶ 87 Thus, I see no legal basis for defendants' claimed right to decline public representation while still demanding government-funded defense resources. By opting out of the government's designated defense provider, a defendant has likewise lost the resources it provides. That result is the natural consequence of the defendant's choice, and it offends neither the Constitution nor the governing statute. I accordingly dissent.

---

**19.** *See also Miller v. Smith,* 115 F.3d 1136, 1143 (4th Cir.1997) (en banc) ("[A]n indigent criminal defendant has no constitutional right to have a particular lawyer represent him."); *Thomas v. Wainwright,* 767 F.2d 738, 742 (11th Cir.1985) ("An indigent criminal defendant has an absolute right to be represented by counsel, but he does not have a right to have a particular lawyer represent him . . . .").

**20.** *Ross v. Moffitt,* 417 U.S. 600, 612, 616, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974); *see id.* ("The question is not one of absolutes, but one of degrees. . . . [T]he fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required. The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process.").