# United States Court of Appeals
## For the First Circuit

No. 16-2120

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD WEED,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Chief Judge,
Selya, Circuit Judge,
and McConnell, District Judge.*

Thomas C. Frongillo, with whom Gus P. Coldebella, Caroline K. Simons, and Fish & Richardson P.C. were on brief, for appellant.
Patrick J. Massari and Erica L. Marshall on brief for amicus curiae Cause of Action Institute.
Alexander P. Robbins, U.S. Department of Justice, Criminal Division, Appellate Section, with whom Kenneth A. Blanco, Acting Assistant Attorney General, Trevor N. McFadden, Acting Principal Deputy Assistant Attorney General, William D. Weinreb, Acting United States Attorney, and Sarah E. Walters and Eric A. Forni, Assistant United States Attorneys, were on brief, for appellee.

---

* Of the District of Rhode Island, sitting by designation.

October 6, 2017

**HOWARD**, **Chief Judge**.  Richard Weed, a securities lawyer, wrote false opinion letters so that his two co-conspirators could sell stock to the public in a "pump and dump" scheme.[1]  In connection with this conduct, he was convicted of securities fraud, wire fraud, and conspiracy to commit both.  Following the jury's guilty verdict, Weed moved for a judgment of acquittal.  He argued that the evidence was insufficient to support his convictions, relying on a novel interpretation of a particular Securities Act provision.  The district court denied Weed's motion.  After careful consideration, we affirm.

## I.

### A.  Trial Evidence

Because of the jury's guilty verdict, we review the record "in the light most favorable to the prosecution."  United States v. Manso-Cepeda, 810 F.3d 846, 847 (1st Cir. 2016).  The trial evidence established that Weed participated in a pump and dump scheme with two former stockbrokers, Coleman Flaherty and Thomas Brazil.  From 2008 to 2013, these conspirators ran several iterations of the scheme, using a public "shell" company that Flaherty had acquired from Weed in 2008.

---

[1] "In a typical 'pump and dump' scheme, insiders inflate demand for a stock by disseminating laudatory information about a company—information that is usually false.  If the market reacts favorably, the insiders cash in their shares before the market readjusts and the share price collapses."  Garvey v. Arkoosh, 354 F. Supp. 2d 73, 76 n.4 (D. Mass. 2005).

First, Flaherty and Brazil would identify an entrepreneur who owned a privately held target company and offer to help take the target public through a "reverse merger" with the shell company.[2] Once the entrepreneur accepted the offer, Weed would complete the legal work needed to carry out the merger. The resulting post-merger company would be publicly listed under the target's name.

On paper, Flaherty and Brazil would hold only debt in the post-merger company, in the form of promissory notes, which could be converted into shares of stock. To make money, Flaherty and Brazil would arrange for stock promoters to inflate the company's value artificially by, for example, issuing glowing press releases about the company's prospects. Then — and this is where Weed's expertise as a securities lawyer was critical —

---

[2] "A reverse merger is a transaction in which a privately-held corporation acquires a publicly-traded corporation, thereby allowing the private corporation to transform into a publicly-traded corporation without the necessity of making an initial stock offering. Often, . . . the public corporation is a shell company with minimal assets and liabilities and no actual operations. To effect the reverse merger, the shell public corporation will exchange its treasury stock for all outstanding shares of the privately-held corporation. In consideration, the controlling shareholders of the shell public corporation transfer a majority of their shares to the owners of the private corporation. After the transaction, the newly merged public corporation will assume the identity and name of the former private company. Thus, the private corporation is transformed into a publicly traded company, without going through the complicated process of an initial stock offering." SEC v. M & A W. Inc., 538 F.3d 1043, 1046-47 (9th Cir. 2008).

Flaherty and Brazil would convert their promissory notes into freely tradable stock, sell their overvalued shares to an unwitting public, and stop investing in the company, which would soon collapse. As Weed put it to Flaherty, "the deals are all vapor, and they can't sustain themselves for six weeks."

With Weed's help, Flaherty and Brazil ran through four iterations of this scheme, making about $5 million in the process. Weed was prepared to run the scheme a fifth time, but by then Flaherty had begun cooperating with the Federal Bureau of Investigation. The conspiracy unraveled, and Weed was arrested in November 2014. He was ultimately indicted for securities fraud, 15 U.S.C. §§ 78j(b), 78ff(a); wire fraud, 18 U.S.C. § 1343; and conspiracy to commit securities fraud and wire fraud, id. § 371.

**B.    Securities Law Background**

Under the Securities Act of 1933 ("Securities Act"), anyone seeking to sell a security must first register that security unless an exemption applies. See 15 U.S.C. § 77e. This registration requirement "protect[s] investors by promoting full disclosure of information thought necessary to informed investment decisions." SEC v. Ralston Purina Co., 346 U.S. 119, 124 (1953). Two exemptions from registration are of particular relevance to this appeal.

Section 3 of the Securities Act exempts certain "classes of securities" from registration. 15 U.S.C. § 77c(a). In

particular, Section 3(a)(9) exempts "any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange." Id. § 77c(a)(9).

Section 4 of the Securities Act exempts certain "transactions." Id. § 77d(a). In particular, Section 4(a)(1) exempts "transactions by any person other than an issuer, underwriter, or dealer." Id. § 77d(a)(1). The statute defines "underwriter" broadly to include anyone "who has purchased from an issuer . . . [or from] any person directly or indirectly controlling or controlled by the issuer" with "a view to . . . the distribution of any security." Id. § 77b(a)(11). Recognizing the breadth and complexity of this definition, the Securities and Exchange Commission ("SEC") promulgated Rule 144, 17 C.F.R. § 230.144, "to provide greater certainty and security to issuers and investors" by creating a "safe harbor" for the Section 4(a)(1) exemption. SEC v. Kern, 425 F.3d 143, 148 (2d Cir. 2005). As relevant here, a seller can take advantage of this safe harbor if he is a non-affiliate of the issuer and satisfies the other listed criteria. See 17 C.F.R. § 230.144(b)(1).

In the present case, in order to dump their overvalued stock on the public market, Flaherty and Brazil needed to convince

a transfer agent[3] to convert their promissory notes into freely tradable, "unrestricted" securities. Weed's role was essential here: he wrote opinion letters to the transfer agents invoking Rule 144 and representing that "[n]one of the persons who have elected to convert" the notes into stock "are affiliates of the [i]ssuer." But, as Weed now acknowledges, these statements were "wrong." Flaherty and Brazil were, in fact, affiliates of the issuing companies, so they were ineligible for the Rule 144 safe harbor.

## C.    Procedural History

Weed went to trial in May 2016. At the close of the government's case, he summarily moved for a judgment of acquittal and declined to put on any evidence of his own. Ultimately, the jury convicted Weed on all counts. Weed retained new counsel after the verdict and moved for both a post-trial judgment of acquittal and a new trial. See Fed. R. Crim. P. 29, 33. In so doing, Weed, for the first time, made the argument that is now the focus of his appeal: that irrespective of his knowing misstatements about Rule 144, Section 3(a)(9) of the Securities Act provided an alternative ground to exempt all of the securities from registration. Thus, according to Weed, his "opinion letters were correct, even though

---

[3] "A transfer agent is responsible for recording changes of ownership of securities, canceling obsolete certificates, and issuing new ones." Geiger v. SEC, 363 F.3d 481, 486 n.3 (D.C. Cir. 2004) (citation omitted).

for the wrong reason."  The district court rejected this argument and denied Weed's motions.

**II.**

On appeal, Weed primarily argues that, in light of his interpretation of Section 3(a)(9), the trial evidence was insufficient to support his convictions.  He also claims that the district court constructively amended the indictment in its instructions to the jury.  We address these arguments in turn.

## A.    Evidentiary Sufficiency

As an initial matter, the parties dispute whether Weed preserved his Section 3(a)(9) argument for appeal.  Because Weed's claims are easily disposed of on the merits, we decline to decide this preliminary question and assume, favorably to Weed, that the de novo standard of review governs.  In the Rule 29 context, the operative question is "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, . . . established each element of the particular offense[s] beyond a reasonable doubt."  United States v. Richard, 234 F.3d 763, 767 (1st Cir. 2000).

The bulk of Weed's appellate brief is devoted to arguing that Section 3(a)(9) permanently exempts an entire "class[] of securities," and thus is not a mere transactional exemption like the ones found in Section 4.  15 U.S.C. § 77c(a).  If this is correct, the provision would not only have applied to Flaherty and

- 8 -

Brazil's initial conversion of their debt to common stock,[4] but also to all subsequent transactions in the resulting securities. Weed's proffered interpretation of Section 3(a)(9) is, however, contrary to the reading that the SEC has consistently employed for more than eighty years. See, e.g., Thompson Ross Sec., 6 S.E.C. 1111, 1118 (1940); Letters of Gen. Counsel Discussing Application of Section 3(a)(9), Securities Act Release No. 646, 1936 WL 31995, at *4 (Feb. 3, 1936).

Even assuming for the sake of argument that Weed is right about the meaning of Section 3(a)(9), that in itself would not entitle him to relief. This is so because Weed was not charged with the sale of unregistered securities or conspiracy to commit that offense. Instead, he was charged with fraud based on his opinion letters falsely stating that the Rule 144 safe harbor applied. On appeal, Weed raises two narrow arguments as to how his view of Section 3(a)(9) entitles him to acquittal. First, he claims that, because the underlying securities were not required to be registered, it was "legally impossible" for him to commit the charged offenses. Second, he contends that, because Section 3(a)(9) provided an alternative ground for exemption, his misstatements about Rule 144 were immaterial as a matter of law.

---

[4] In the district court, the government took the position that the "Section 3(a)(9) exemption likely did apply" to this initial conversion.

The first of these arguments need not detain us long. Weed's legal impossibility defense is entirely predicated on a misreading of the indictment, namely, Weed's assertion that "all" of his convictions are "based on the theory that he conspired to sell unregistered stock." In Weed's view, because the shares at issue were exempt from the Securities Act's registration requirement, "no statute prohibited" the activity in which he planned to engage. United States v. Fernandez, 722 F.3d 1, 32 (1st Cir. 2013). But Weed does not adequately explain how the purported Section 3(a)(9) exemption negates the federal prohibitions on fraud that the jury found him to have violated. Even assuming that the exemption applied and the conspirators were thus entitled to receive freely tradable shares, that fact would not excuse Weed's resort to misrepresentations to help Flaherty and Brazil obtain the stock. Indeed, an individual "who elects . . . a course" of fraudulent "self-help may not escape the consequences by urging that . . . the statute which he sought to evade" did not apply. Dennis v. United States, 384 U.S. 855, 867 (1966). Ultimately, despite Weed's protestations to the contrary, "[t]his is a prosecution directed at [Weed's] fraud[,] . . . not an action to enforce" the Securities Act's registration requirement. Id.

The crux of the second of Weed's Section 3(a)(9) arguments is that the applicability of that exemption rendered his

false statements about Rule 144 immaterial as a matter of law. Materiality is a required element of both securities fraud and wire fraud. See Neder v. United States, 527 U.S. 1, 25 (1999) (wire fraud); Flannery v. SEC, 810 F.3d 1, 9 (1st Cir. 2015) (securities fraud). In the securities context, "[a] misrepresentation is material if there is a substantial likelihood that [it] would affect the behavior of a reasonable investor." SEC v. Ficken, 546 F.3d 45, 47 (1st Cir. 2008). This standard presents a "mixed question of law and fact," involving "delicate assessments of the inferences a 'reasonable [investor]' would draw from a given set of facts and the significance of those inferences to him." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976). For this reason, the materiality issue is "peculiarly one[] for the trier of fact" and may only be resolved "as a matter of law" where the relevant misstatements "are so obviously important [or unimportant] to an investor, that reasonable minds cannot differ on the question." Id. (citation omitted).

Here, we need not resolve the parties' dispute about the correct interpretation of Section 3(a)(9).[5] This is because, even if Weed's novel position is correct, a reasonable jury could nonetheless find that his admitted lies about the applicability of Rule 144 were material. Weed fully acknowledges that his reading

_____

[5] And we similarly need not weigh in on what, if any, deference is owed to the SEC's interpretation of that provision.

- 11 -

of Section 3(a)(9), to apply not only to the initial exchange with the issuer but also to all subsequent transactions in the relevant securities, contradicts over eighty years of securities law, albeit in the civil enforcement context. We have little difficulty concluding that a reasonable transfer agent,[6] or a subsequent purchaser of the shares for that matter, might be hesitant to rely on such an untested theory. Indeed, Weed fails to point to a single case or other authority interpreting the Section 3(a)(9) exemption in the manner that he now proposes. And, moreover, Weed concedes that "[e]ach . . . transfer agent" did, in fact, "rel[y] on" his Rule 144 representations to issue the requested stock. Thus, the district court's denial of Weed's Rule 29 motion was correct, irrespective of the merits of his underlying position on Section 3(a)(9).[7]

---

[6] Weed fails to develop any argument that, in order to be convicted, his misstatements had to be material to investors, as opposed to the transfer agents who were the direct recipients of his opinion letters. Any argument on this point is therefore waived. Moreover, courts have interpreted the federal securities laws to proscribe frauds against intermediaries, as well as those perpetrated directly on investors. See United States v. Naftalin, 441 U.S. 768, 770 (1979) (holding that Securities Act "prohibits frauds against brokers as well as investors"); see also 15 U.S.C. § 78j(b) (prohibiting "direct[] or indirect[]" fraud in connection with a securities transaction).

[7] Weed also attempts to repackage his Section 3(a)(9) argument to impugn the district court's denial of his motion for a new trial under Rule 33. For the same reasons discussed above, we find no "manifest abuse of discretion" and, accordingly, reject Weed's claim. United States v. Villarman-Oviedo, 325 F.3d 1, 15 (1st Cir. 2003).

## B.    Constructive Amendment

Weed's final plaint is that the district court constructively amended the indictment in its instructions to the jury. "[A] constructive amendment occurs when the charging terms of an indictment are [effectively] altered . . . by prosecution or court after the grand jury has last passed upon them." United States v. Taylor, 848 F.3d 476, 495 (1st Cir. 2017) (first alteration in original) (citation omitted); see also United States v. Dowdell, 595 F.3d 50, 67 (1st Cir. 2010) (explaining distinction between literal and constructive amendments). Because Weed did not contemporaneously object, we review his claim for plain error. See Taylor, 848 F.3d at 495. Accordingly, in order to prevail, Weed must establish that "an error occurred which was clear or obvious and which not only affected [his] substantial rights but also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. at 488 (citation omitted). Weed falls well short of satisfying this exacting standard.

Weed bases his constructive amendment claim on a single isolated remark made at the beginning of the court's instructions on wire fraud, after the judge had already discussed the elements of securities fraud and conspiracy. The court directed the jury to specific paragraphs in the indictment's "general allegations" pertaining to the purposes of the charged conspiracies. It then

noted, "[t]he government says one purpose of the conspiracy was to offer and sell unregistered securities in violation of the federal securities laws. That is the Securities Fraud. And then another purpose was to engage in a pump-and-dump scheme . . . ." Weed argues that this language constructively amended the indictment to allow the jury to return a guilty verdict on the securities fraud charges based solely on a finding that "Weed sold or offered to sell unregistered securities."

Viewed "in their totality," however, we are confident that the court's instructions accurately conveyed the elements of securities fraud. United States v. Melendez, 775 F.3d 50, 58 (1st Cir. 2014). The statement to which Weed's complaint is directed was merely an attempt to orient the jurors by distinguishing the conspiratorial object that the court had already discussed (securities fraud) from the one that it was currently addressing (wire fraud). The stray remark did nothing to alter the court's prior instructions on securities fraud, which did not so much as mention "unregistered securities." In fact, the court made clear that the "guts of the Government's case" were Weed's alleged "misstatements of material fact concerning control shares and the distribution of control shares." Weed utterly fails to explain how, in this context, any error in the fleeting statement challenged on appeal "prejudiced his defense." Taylor, 848 F.3d at 496. This omission dooms his constructive amendment claim.

## III.

For the foregoing reasons, we **<u>AFFIRM</u>** Weed's convictions.