**2021 UT App 24**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DANIEL CHRIS KITCHES,
Appellant.

Opinion
No. 20181037-CA
Filed March 11, 2021

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 171910265

Debra M. Nelson and Wendy J. Brown, Attorneys
for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion,
in which JUDGE RYAN M. HARRIS and
SENIOR JUDGE KATE APPLEBY concurred.[1]

MORTENSEN, Judge:

¶1     Daniel Chris Kitches monitored the text messages his ex-wife (Ex-Wife) sent and discovered that she started dating soon after their divorce. When he learned she had spent the night with her new boyfriend, Kitches menaced her over the course of eight days—principally by threatening to distribute a video he previously made of himself and Ex-Wife engaged in an intimate

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

act—until he was eventually arrested. A jury convicted Kitches of numerous offenses, and he now appeals. We affirm.

BACKGROUND[2]

¶2      Kitches and Ex-Wife were married for eight years and had two children together. But the marriage turned tumultuous in its final years, so they agreed to separate in March 2017. Although Kitches and Ex-Wife occasionally argued about their children, their interactions were somewhat amicable between the time Ex-Wife moved out of the marital home in March 2017 and when their divorce was finalized in August that year. The eventual divorce decree awarded joint physical and legal custody of the children and limited communication between Kitches and Ex-Wife to child-related issues.

¶3      In the decree, Kitches and Ex-Wife agreed to maintain their cell phone plan until they finished paying off their phones. Within a few days of the divorce being finalized, Kitches damaged his phone and asked Ex-Wife (the primary account holder) to activate one of his old phones, which she did. Ex-Wife was unaware that reactivating Kitches's old phone initiated "integrated text messaging," enabling him to see any text messages she sent or received.

¶4      For approximately two weeks, Kitches actively monitored Ex-Wife's text messages without notifying her that he could do so. Among others, he read messages in which Ex-Wife

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Cruz*, 2020 UT App 157, n.1, 478 P.3d 631 (cleaned up).

complained to her friends and family about the divorce. He also read the messages Ex-Wife sent and received from her new boyfriend (Boyfriend). Things took a new course when Ex-Wife and Boyfriend sent messages which made apparent that they spent a night together at Boyfriend's house. Kitches quickly messaged Ex-Wife to confront her about the overnight stay and, in the process, admitted to her that because of the integrated messaging, he had been able to—and did—monitor her text messages. Ex-Wife immediately called the phone company and disabled the feature.

¶5 Later that day (September 5), Kitches phoned Ex-Wife and informed her that he had digitally recorded the two of them having sex on a previous occasion, and he threatened to send the video to her family, friends, and Boyfriend. Ex-Wife was "shocked" by Kitches's admission that he had filmed them having sex and she was afraid he would follow through on his threat. Thinking it would impede Kitches's ability to send the video to anyone, Ex-Wife called the phone company and canceled his cell phone service.

¶6 The next day (September 6), Ex-Wife sent Kitches an email asking to meet at their phone company's storefront so that they could separate their phone service. Kitches responded by confronting Ex-Wife about text messages she had sent about the divorce and demanded that she turn on his phone service. Ex-Wife replied, "I want all the videos and messages off your phone first, then I have no problem doing so. You have no right to send *a video that I was not nor would I consent to*." (Emphasis added.) Kitches asserted "[t]hey [we]re not on [his] phone" and told her that—in the course of monitoring her text messages—he had saved "half naked pics" that she sent to Boyfriend. When Ex-Wife again asked Kitches to delete all the foregoing and asked whether he was "planning on blackmailing [her]," Kitches responded by stating, "No deal." He also expressed his desire to

"warn" Boyfriend that Ex-Wife would "do absolutely anything to harm another person."

¶7    That night, Boyfriend sent Kitches an email stating, "[O]ur mutual friend, [Ex-Wife,] said you have been talking about me and had something you wanted to tell/show me. So here's my contact info." Boyfriend later testified that he reached out to Kitches in an apparent attempt to defuse the situation, as he was also a divorced father and thought he might be able to resolve Kitches's concerns. Kitches emailed back that Ex-Wife was a "sociopath" and one of the most "despicable human beings" he had ever met. Kitches also told Boyfriend that he had a video of himself and Ex-Wife having sex and offered to send it to Boyfriend:

> I actually have [a] time . . . stamped video, and it was the film sex, it was the film [of] her while she was over here so she couldn't accuse me of anything ever again. My attorney said film and record everything. So if you'd like a copy, which I don't think you do, I have it.

When Boyfriend asked to see the video, Kitches responded that "for half a second [he] thought about sending it to [Boyfriend]," but "there is a law that says you cannot forward nudity."

¶8    The following morning (September 7), Kitches sent Ex-Wife an email asking her to turn his phone service back on, which Ex-Wife again indicated she would do only if he deleted the video. Kitches demanded she turn on his phone and alluded to highly intimate portions of the video. Ex-Wife responded by expressing concern that her "boss [wa]s at [her] desk," to which Kitches sent the ominous reply, "Sending." He sent a follow-up email one minute later, which said only, "Sent." When Ex-Wife explained that sending the video was illegal, Kitches responded, "You have 5 minutes. I will send." Ex-Wife believed that Kitches

would follow through on his threat, so she acquiesced to his demand and contacted the phone company, instructing it to turn his cell phone service back on. While Ex-Wife was on the phone with the phone company, Kitches sent her emails complaining that she was not reactivating his phone service quickly enough. He also interrogated her about her sexual involvement with Boyfriend and demanded she not allow their children to be around Boyfriend.

¶9      Later that day, after turning Kitches's phone service back on, Ex-Wife drove to his office to ensure that he would delete the video. When she arrived, Kitches sarcastically "asked if she wanted to watch the video and [said] that he and his coworkers watched it in the mornings while eating donuts." Kitches eventually feigned agreement to delete the video, and while Ex-Wife looked over his shoulder, he appeared to delete several video files from his work computer.

¶10      But the next morning (September 8), Kitches sent Ex-Wife a text message informing her that he still had "five videos" which he threatened to send to her employer—specifically, her supervisor—and Boyfriend. Ex-Wife felt she had lost control of the situation and called the police, but she declined to press charges because they had "just gone through a divorce" and she only wanted the videos deleted. An officer then contacted Kitches and informed him that it would be a crime for him to send the videos. Kitches told the officer he would not send the videos to anyone.

¶11      The next night (September 9), Ex-Wife planned to watch a football game at Boyfriend's house in Orem. Because the game did not start until 8:30 p.m., she arranged for the children to spend the night at her parents' house in West Valley. Ex-Wife and Boyfriend had dinner, watched the game, and fell asleep in Boyfriend's bedroom.

¶12    Meanwhile, Kitches drove by Ex-Wife's house in Sandy at about 2:00 a.m. (September 10). Apparently, he was looking to see whether she was home. When he saw that Ex-Wife's truck was not parked at her house, he performed an internet search of Boyfriend's name on his phone and found Boyfriend's address.

¶13    Kitches drove to Boyfriend's house, arriving at approximately 4:30 a.m., and aggressively pounded on the front door. In the process, he realized that Boyfriend's doorbell had a camera on it, so he pulled the doorbell out of the wall. He also sent Ex-Wife a text message that said he was "coming in" to take the children. Ex-Wife was frightened by the fact that Kitches had found her in the first place, and Boyfriend immediately contacted the police.

¶14    The police arrived at Boyfriend's house at approximately 4:40 a.m., by which time Kitches had already fled the scene. Ex-Wife spoke with police and was visibly "frantic, especially about the welfare of her children." While she was providing a witness statement to the officer, Kitches called Ex-Wife on her cell phone. The officer answered Ex-Wife's phone and spoke to Kitches. Kitches was aggressive on the phone and expressed his concern that his children were in the house while Ex-Wife was having sex in the next room. He then cursed at the officer before hanging up the phone. Soon after, Kitches messaged Ex-Wife stating,

> I know that wasn't a cop. You dumbass mother F'er. . . . Come outside. Come outside. Come outside now. What, you can't have a conversation? What are you afraid of me you F'ing mother F'er? . . . And you call yourself a good mother. Really, a good mother sleeping with a guy after three F'ing weeks with the kids.

¶15    Kitches sent this text message in the course of driving to Ex-Wife's parents' house, where he arrived at approximately 5:00 a.m. Kitches snuck around to the back of the house and entered through an unlocked door. After getting inside the house, Kitches walked to the room the children were sleeping in, looked in, and then left the house soon thereafter. Ex-Wife's father was awake and observed all the foregoing from a couch in the living room. Ex-Wife's father was "frightened" and "didn't know what to expect," so he did not attempt to stop Kitches from entering or moving about the house because he "didn't want to confront" an intruder.

¶16    Ex-Wife went to get her children from her parents' house as soon as she finished speaking with police and arrived there at approximately 6:00 a.m. Ex-Wife's father informed her that he had observed Kitches enter the house about an hour earlier, and she immediately called the police again. While Ex-Wife was speaking to police, Kitches continued to send her text messages calling her a "slut" and threatening to seek sanctions in their divorce case because she spent the night at Boyfriend's house. He also denied that he went to Ex-Wife's parents' house that morning, claiming he "was with [his] girlfriend."

¶17    Two days later (September 12), Ex-Wife sent Kitches an email telling him to stop emailing Boyfriend. Kitches implied that Boyfriend invited the ongoing emails, and the two sent a few emails back and forth arguing about this issue. Ex-Wife again turned Kitches's phone plan off because she was frustrated and felt as though Kitches's conduct was taking over her life: he was emailing her at work about the video (after claiming that he deleted it), he was communicating with Boyfriend and potentially ruining that relationship, and her parents had suddenly become involved. Kitches signed up for his own phone service that day and sent the following message to Ex-Wife:

Every Friday for two months, Sunday night and others, you leave around noon and I can't get [the children] until 5, Saturday, Sunday and all the other times I don't know. Great mom. Great mom out sleep around. Um, great mom out sleep around. Class. We're all proud of you two weeks and F'g with a troll. Sorry making love. At least when you get prego I don't have to pay. You are a B telling the kids on me. Wow, I'm so angry. Your fault. . . . Oh, sorry your legs are probably above your head.

¶18 The following morning (September 13), Kitches sent Ex-Wife a text message containing clips of the video he made of the two of them having sex. He followed up by sending the video to both her personal and work email addresses. The emails consisted only of the video attachments. Ex-Wife called the police and finally decided to pursue charges about the video because,

He's now taunting me with—he's now physically sent me a video that I never consented to, but he's been threatening to do it for the past five days. That I have not gone to any law enforcement. I just have asked him to delete them. And . . . at some point I had to do something because I—what this was doing to me emotionally, I had to—I had to fight back. I had to do something.

¶19 The next day (September 14), Kitches spoke with two detectives at the police station. He claimed the video was made approximately nine months earlier, around December 2016 or January 2017, and that Ex-Wife was aware she was being recorded at the time. But Kitches allowed the detectives to download the contents of his phone, and the files showed that the video was created on July 18, 2017, only two months earlier.

When the officer pointed out this discrepancy, Kitches claimed he misinterpreted the prior question about the date the video was made. Kitches also initially denied he sent the video to anyone, but he later admitted that he sent it to Ex-Wife as "an implied threat."

¶20 As part of the investigation, a detective specializing in burglary also questioned Kitches about the morning of September 10. Kitches claimed he went to Boyfriend's house to "make sure the kids were okay," but he also admitted that he wanted to "send[] a message" and make Boyfriend fear him. Kitches also denied that he went to Ex-Wife's parents' house that morning, accusing Ex-Wife and her father of concocting the story and filing a false police report in retaliation for Kitches not agreeing to switch weekends for parent-time with the children.

¶21 Police arrested Kitches that afternoon. They later executed a search warrant for his work computer and found six different files depicting the sexual encounter from July 18, 2017. They also found a separate video which depicted Ex-Wife showering in the marital home. Kitches was subsequently charged with two voyeurism counts for making both recordings, one count of voyeurism-distribution for sending the recording of the sexual encounter to Ex-Wife, one count of criminal stalking based on various instances described above, and one count of criminal trespassing for entering Ex-Wife's parents' house on September 10.

¶22 At trial, Ex-Wife testified about the content of both videos—the recording of the sexual encounter and the recording of her taking a shower—and stated that she did not consent to being filmed on either occasion. She explained that the video of the sexual encounter depicted events on July 18, 2017, and she had no idea she was being recorded. That day, Ex-Wife visited the marital home to pick up some of her belongings and Kitches

talked about reconciling in a very "heartfelt" manner, and this conversation led to physical intimacy in the guest bedroom. Kitches's phone—the recording device—evidently was placed on a dresser in the guest bedroom, and the video depicts the room as being empty before Kitches led Ex-Wife into the room with him, lay down on the bed, and requested to have sex with her. In the video, Ex-Wife expressed concerns about getting intimate in the guest room because she thought a neighbor might be able to see them through the window, but Kitches insisted that it was "okay" and the neighbor could not see them. She eventually consented to the sexual encounter.

¶23   Regarding the shower recording, Ex-Wife testified that it too was recorded in the marital home, but it must have been recorded before March 15, 2017—the date she moved out of the marital home. She testified that, based on her observation of the video, "it looks from the angle that it was kind of tucked in the corner, and it almost looks like it was hidden or covered somewhat by, like, a towel, to where I wouldn't even . . . look to see if there was a phone or filming device in there." Ex-Wife testified that she never recorded herself taking a shower in the bathroom nor had she ever agreed to be recorded in the shower on any occasion.

¶24   Kitches moved for a directed verdict generally on all counts. But in arguing his motion, Kitches specifically took issue with two counts. First, he argued that he could not be convicted for voyeurism-distribution for sending the recording of the sexual encounter to Ex-Wife. Second, he argued that he could not be convicted for trespassing because he reasonably believed he had permission to enter Ex-Wife's parents' house. The trial court denied Kitches's motion in its entirety. Subsequently, the jury convicted Kitches on all counts. He now appeals each of his convictions.

PRESERVATION

¶25   Kitches asks for reversal, arguing that the State failed to present sufficient evidence to support any of the charges and, accordingly, the trial court should have granted his motion for a directed verdict. He also raises alternative challenges urging us to vacate and remand his voyeurism-distribution and stalking convictions, asserting that the jury was improperly instructed on the elements of these charges. Kitches maintains that he preserved all but one of his claims. He concedes that trial counsel did not object to the allegedly erroneous stalking instruction, and he asks us to review that issue for ineffective assistance of counsel.

¶26   The State argues that almost none of Kitches's claims were preserved and asserts that we should only review the unpreserved ones for ineffective assistance of counsel. But as we discuss below, in our view all the allegedly unpreserved claims fail on their merits anyway.

¶27   We recognize that "[o]ur rules of preservation are critical to the appellate process and are themselves an important mechanism for promoting fairness." *State v. Larrabee*, 2013 UT 70, ¶ 32, 321 P.3d 1136. And because of this, "we should not dilute [our preservation rules] by stretching their standards to justify our consideration of a question we find interesting or important." *In re Baby Girl T.*, 2012 UT 78, ¶ 56, 298 P.3d 1251 (Lee, J., dissenting). Thus, we generally will not review issues unless they were presented "in such a way that the court ha[d] an opportunity to rule on [them]." *State v. Argueta*, 2018 UT App 142, ¶ 44, 429 P.3d 764 (cleaned up). But these rules are "self-imposed," and we retain "wide discretion when deciding whether to entertain . . . matters that are first raised on appeal." *State v. Houston*, 2015 UT 40, ¶ 19, 353 P.3d 55 (cleaned up); *see also Frito-Lay v. Utah Labor Comm'n*, 2009 UT 71, ¶ 30, 222 P.3d 55 ("There are times when a reviewing court may exercise its

discretion in addressing an unpreserved issue . . . .”). And in exercising our discretion, we should remember that our preservation rules exist “to serve judicial economy and to prevent a defendant from failing to object to an issue in the hopes of reversal of a conviction on appeal.” *Houston*, 2015 UT 40, ¶ 19; *see also Salt Lake City v. Josephson*, 2019 UT 6, ¶ 10, 435 P.3d 255 (“When parties fail to preserve issues, we do not receive the benefit of a trial judge’s reasoning and analysis on the issue at hand.” (cleaned up)).

¶28    With these principles in mind, if the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation. This approach accords with the purpose of our preservation rules, as it prioritizes judicial economy without altering the incentive to object at trial. *See, e.g.*, *United States v. Weed*, 873 F.3d 68, 72 (1st Cir. 2017) (“Because [the defendant’s] claims are easily disposed of on the merits, we decline to decide this preliminary question [of preservation] . . . .”); *United States v. Navarro*, 800 F.3d 1104, 1113 (9th Cir. 2015) (choosing to exercise its discretion to reach the merits of the defendant’s unpreserved constitutional claim because the court had “little doubt” that the defendant “failed to demonstrate a constitutional violation”); *Wilson v. Ozmint*, 352 F.3d 847, 868 (4th Cir. 2003) (choosing to reach the merits of the defendant’s unpreserved claim in part because the claim was “patently without merit and therefore easily disposed of” and addressing the merits thus served the interest of judicial economy (cleaned up)); *State v. Webster*, 865 N.W.2d 223, 232 (Iowa 2015) (noting that courts may dispatch cases on the “underlying merits” without deciding the question of preservation). In this case, because we can easily dispose of Kitches’s claims on their merits, we choose to exercise our prerogative to simply assume that Kitches’s claims were preserved and proceed to consideration of the merits.

ISSUES AND STANDARDS OF REVIEW

¶29    As noted above, Kitches asserts that all his insufficiency of the evidence claims were preserved by his directed verdict motion. "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Doyle*, 2018 UT App 239, ¶ 11, 437 P.3d 1266 (cleaned up). "We will uphold the trial court's decision if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* (cleaned up).

¶30    We review the allegedly preserved voyeurism-distribution jury instruction error for correctness. *See State v. Cegers*, 2019 UT App 54, ¶ 19, 440 P.3d 924. And we review the concededly unpreserved stalking instruction error for ineffective assistance of counsel, which presents a matter of law. *See State v. Cruz*, 2020 UT App 157, ¶ 15, 478 P.3d 63.

ANALYSIS

I. Voyeurism

¶31    Kitches contends that the State failed to present sufficient evidence to support either voyeurism conviction. He principally argues that the evidence presented at trial was insufficient to show that Ex-Wife did not consent to being recorded in either instance.

¶32    Utah's voyeurism statute provides,

> A person is guilty of voyeurism who intentionally uses any type of technology to secretly or surreptitiously record video of a person:

(a) for the purpose of viewing any portion of the individual's body regarding which the individual has a reasonable expectation of privacy, whether or not that portion of the body is covered with clothing;

(b) without the knowledge or consent of the individual; and

(c) under circumstances in which the individual has a reasonable expectation of privacy.

Utah Code Ann. § 76-9-702.7(1) (LexisNexis 2017).[3]

¶33    Kitches first contends the evidence was insufficient to show that the recording of the sexual encounter on July 18, 2017,

---

3. We note that section 76-9-702.7(1) was amended in May 2017. For the shower recording, which happened prior to May 2017, the jury was properly instructed on the previous version of the offense. The earlier version is substantively identical to the current version, save for the previous additional requirement that the defendant "*concealed or disguised*" the device used to "secretly or surreptitiously" record a person. *See* Utah Code Ann. § 76-9-702.7(1) (LexisNexis 2014) (emphasis added); *see also State v. Bilek*, 2018 UT App 208, ¶¶ 24–27, 437 P.3d 544 (discussing the distinction between the "concealed or disguised" and the "secretly or surreptitiously" elements). With that said, Kitches's arguments on appeal are not based specifically on this language or any other differences in the previous version of the code. But even if they were, sufficient evidence was introduced to show that the device used to record Ex-Wife in the shower was concealed or disguised: Ex-Wife testified that she did not see the device, and the video itself appeared to depict a towel covering the device. Thus, in addressing Kitches's arguments, we make no further mention of the previous version of section 76-9-702.7(1).

amounted to voyeurism. He argues that the evidence introduced at trial demonstrated that Ex-Wife was "relatively unconcerned" about the existence of the video and was instead concerned only about it being disseminated—which we infer is meant to suggest that if Ex-Wife had not consented to making the video, she would have emphasized this particular point of concern more forcefully. He also points to other evidence that may suggest Ex-Wife consented to or otherwise knew she was being recorded, such as a moment of the video which appears to show Ex-Wife looking in the direction of the recording device.

¶34 Kitches's arguments are unavailing. The State introduced ample evidence to show that Ex-Wife did not consent to being recorded during the sexual encounter. For one thing, as correctly pointed out by the State during closing arguments, what the video depicts was itself circumstantial evidence tending to show "a calculated effort on [Kitches's] part to lure [Ex-Wife] into th[e] bedroom [and] persuade her to have sex, because he knew that there was a camera running." Moreover, Ex-Wife later explicitly stated to Kitches that she did not and would not consent to being recorded in such a video. And notably, Kitches never responded to Ex-Wife by suggesting that she did consent to being filmed. The jury reasonably could infer that Kitches's silence in response to Wife's direct assertion of non-consent was a tacit admission that Ex-Wife's version of events was correct. Relatedly, Kitches's own statement to Boyfriend that he filmed Ex-Wife on the purported advice of *his lawyer* so that Ex-Wife could not "accuse [him] of anything" further supports that Kitches filmed the encounter without Ex-Wife's knowledge or consent. Regardless, Ex-Wife directly testified at trial that she never consented to being filmed. And given the particular facts of the case and the nature of the charge at issue, this testimony in and of itself was "some evidence" of Ex-Wife's lack of consent that would justify submitting the issue to the jury. *See supra* ¶ 29.

¶35    As the foregoing demonstrates, Kitches's arguments amount to nothing more than assertions that *conflicting* evidence was introduced on this element. "But the existence of conflicting evidence alone cannot justify taking the case away from the jury. To the contrary, when the evidence presented is conflicting or disputed, the jury serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence." *State v. Cruz*, 2020 UT App 157, ¶ 23, 478 P.3d 631 (cleaned up). Here, the jury could permissibly resolve that the substantial evidence demonstrating Ex-Wife's lack of consent to being recorded outweighed the comparably minimal evidence that may have allowed a different finding.

¶36    Kitches next contends that the evidence introduced in support of his voyeurism conviction for the shower recording was insufficient in several regards. He argues that "the State failed to provide evidence that the recording of [Ex-Wife] showering was nonconsensual, who recorded it, or even when the recording occurred." With regard to the argument about the timing of the offense, Kitches essentially assails the fact that, because Ex-Wife was not sure exactly when she was recorded in the shower other than testifying that it had to have happened before she moved out of the marital home, the jury was instructed that the offense took place sometime between January 1, 2017, and March 31, 2017.

¶37    Kitches's arguments again are unpersuasive. As before, what the video depicted was circumstantial evidence that Ex-Wife was unaware she was being recorded, and Ex-Wife also directly testified that she never was aware of or consented to being recorded in the shower. The State thus introduced sufficient evidence that Kitches filmed Ex-Wife in the shower without her consent. Second, it was never in any genuine dispute that the video was both recorded in the master bathroom of the marital home and recovered from Kitches's computer. These facts permitted a reasonable inference that Kitches was the

individual who recorded Ex-Wife in the shower. And Kitches's final argument about the date is irrelevant to whether the evidence introduced at trial was sufficient because "the specific date of the act is not an element of the crime." *State v. Gulbransen*, 2005 UT 7, ¶ 31, 106 P.3d 734, *abrogated on other grounds by Met v. State*, 2016 UT 51, 388 P.3d 447; *see generally* Utah Code Ann. § 76-9-702.7. Moreover, because the offense of voyeurism requires that the victim not be aware that they were being recorded in the first place, requiring the date of the offense to be presented with razor-like precision would defeat the goal of the statute, as it would effectively bar prosecution in the run of cases absent an admission by the offender as to the date that they "secretly or surreptitiously" recorded their victim.

¶38   Based on the foregoing, the State presented sufficient evidence to support both of Kitches's voyeurism convictions. Accordingly, we reject his contention that we should reverse these convictions.

## II. Voyeurism-Distribution

¶39   Along with his voyeurism convictions stemming from recording Ex-Wife in the sexual encounter and in the shower, Kitches also was convicted for distribution under the voyeurism statute—a separately defined offense that carries a higher penalty for distributing the voyeuristic material. *See* Utah Code Ann. § 76-9-702.7(3) (LexisNexis 2017). Both of Kitches's challenges to this conviction—regarding the sufficiency of the evidence and the allegedly erroneous jury instruction—are premised on the same two assumptions: (1) the evidence demonstrated that Kitches sent the video only to Ex-Wife and (2) sending the voyeuristic material to the victim does not count as "distribution" under the statute, which instead requires that the voyeuristic material be sent to "uninvolved third parties." He thus argues that the evidence was necessarily insufficient to support his voyeurism-distribution conviction and likewise

argues the jury was erroneously instructed that it could convict him if it found that he sent the voyeuristic material only to Ex-Wife.[4]

¶40   Subsection (3) of the voyeurism statute[5] outlines the offense of voyeurism-distribution. As is relevant, it provides that "[d]istribution or sale of any images, including in print, electronic, magnetic, or digital format, obtained under [the subsection of the statute that outlines the base offense of voyeurism] by transmission, display, or dissemination" is a separate offense under the voyeurism statute and "is a third degree felony." *Id.* Although subsection (3) outlines the offense of voyeurism-distribution, the term "distribution" is not defined anywhere in the voyeurism statute. *See generally id.* § 76-9-702.7.

¶41   Kitches argues that the ordinary and accepted meaning of distribution "necessarily means broadening access to an item, spreading out or dispersing," and thus requires the defendant to

---

4. At oral argument, Kitches asserted that the trial court should not have defined the term "distribution" at all in the jury instructions. But Kitches failed to meaningfully develop this argument in his opening brief. *See State v. Sloan*, 2003 UT App 170, ¶ 13, 72 P.3d 138 ("An issue is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." (cleaned up)). As a result, we will not address this argument. *See Utah Physicians for a Healthy Env't v. Executive Dir. of the Utah Dep't of Env't Quality*, 2016 UT 49, ¶¶ 28–38, 391 P.3d 148 (noting that it would "turn the briefing process on its head" if the court were to consider arguments not developed in the opening brief).

5. Any future references to "subsection (3)," if not otherwise specified, refer to Utah Code section 76-9-702.7(3).

have sent the voyeuristic material to "an individual who is not a party to the intimate act depicted." And he asserts that such an interpretation is necessary to read subsection (3) in harmony with Utah Code section 76-5b-203—colloquially referred to as Utah's revenge-porn statute—which outlines the offense of "[d]istribution of an intimate image." *See id.* § 76-5b-203(2) (2020). The revenge-porn statute provides that it is a class A misdemeanor "if the actor knowingly or intentionally distributes to *any third party* any intimate image" if, among other things, "the actor knows that the depicted individual has not given consent to the actor to distribute the intimate image" and "the intimate image was created by or provided to the actor under circumstances in which the individual has a reasonable expectation of privacy." *See id.* (emphasis added). Kitches seizes on the fact that the revenge-porn statute explicitly requires the actor to send the intimate image to a "third party" and asserts that it would be "nonsensical" to interpret "distribution" under subsection (3) in any way that does not embrace this same requirement.

¶42 Whether "distribution" under subsection (3) requires the defendant to distribute the offending material to a third party is a question of statutory interpretation. "When interpreting a statute, we rely first on the statute's plain language as the best evidence of the legislature's intent." *State v. Bilek*, 2018 UT App 208, ¶ 24, 437 P.3d 544 (cleaned up). "In so doing, we read each term according to its ordinary and accepted meaning." *State v. Davis*, 2011 UT 57, ¶ 21, 266 P.3d 765 (cleaned up). "We also presume that the expression of one term should be interpreted as the exclusion of another, thereby presuming all omissions to be purposeful." *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 (cleaned up). And "we read the language of the statute as a whole and also in its relation to other statutes." *Davis*, 2011 UT 57, ¶ 21 (cleaned up). This is to say that we interpret the language of the statute at issue "in harmony with other statutes

in the same chapter and related chapters." *State v. Rushton*, 2017 UT 21, ¶ 18, 395 P.3d 92 (cleaned up).

¶43 We disagree that the ordinary meaning of distribution "*necessarily* means broadening access to an item." (Emphasis added.) While distribution *can* denote a broadening of access, it also is defined more generally as "to deliver." *See Distribute*, Black's Law Dictionary (11th ed. 2019). And the simple act of "delivery" is clearly met when the defendant sends the voyeuristic recording to any person, including the person depicted.[6] But the same would be true even if we were to accept Kitches's preferred definition that distribution requires "broadening access to an item." Under subsection (3), the "item" of concern is the recording that was "obtained under [s]ubsection (1)"—i.e., the voyeuristic recording. *See* Utah Code Ann. § 76-9-702.7(3). Whether the defendant sends that recording to a third party, or instead sends it to the individual who, "without the[ir] knowledge or consent," was "secretly or surreptitiously" recorded, access to the recording has been broadened. *See generally id.* § 76-9-702.7.

¶44 And although we agree that the revenge-porn statute is a related statute that should be harmonized with subsection (3), that statute further elucidates that "distribution" occurs under

---

6. At oral argument, the parties raised the issue of whether "distribution" occurs, within the meaning of subsection (3), if the victim were to ask the defendant to send the victim the video. In our view, the statute as currently worded criminalizes any distribution of the material and makes no room for an exception which would, in effect, absolve the defendant of distribution merely because a concerned victim seeks to determine whether they were secretly or surreptitiously recorded. If this was not the legislature's intent, it is of course able to amend the statute to provide for a different result.

subsection (3) whether the defendant sends the voyeuristic recording to the victim or to another person. Kitches's argument to the contrary fixates on the fact that, in setting forth the *elements of the offense*, the revenge-porn statute specifies that distribution must be "to any third party." *Id.* § 76-5b-203(2). But he overlooks the fact that the statute separately defines the term "distribute" and does so in a way that omits any requirement that the actor send the intimate image to a third party:

> "Distribute" means selling, exhibiting, displaying, wholesaling, retailing, providing, giving, granting admission to, providing access to, or otherwise transferring or presenting an image to *another individual*, with or without consideration.

*Id.* § 76-5b-203(1)(a) (emphasis added); *see also Phillips v. Department of Com.*, 2017 UT App 84, ¶ 27, 397 P.3d 863 ("We seek to give effect to omissions in statutory language by presuming all omissions to be purposeful." (cleaned up)). And applying this definition to the term "distribution" in subsection (3) leads to one result: a defendant commits the offense at the moment they send the voyeuristic material to "another individual," which necessarily includes the person depicted. *See* Utah Code Ann. § 76-5b-203(1)(a). Moreover, the fact that the legislature narrowly circumscribed the offense in the revenge-porn statute to include distribution only to a "third party," but did not include any such requirement in subsection (3), further evinces that the legislature intended for distribution under subsection (3) to embrace the broader definition. The legislature apparently knew how to narrow subsection (3)'s applicability but chose not to.

¶45 Such an interpretation also harmonizes the statutes' respective purposes. As a general matter, the revenge-porn statute is intended to prevent a situation in which the victim is *willingly* recorded and *willingly* provides that recording to the

defendant (either by sending it to the defendant or by consenting to the defendant recording the act depicted), and the defendant then turns around and distributes that recording to a "third party," i.e., someone to whom the defendant "knows that the depicted individual has not given consent to the [defendant] to distribute the intimate image." *See id.* § 76-5b-203(2). The revenge-porn statute thus recognizes that the defendant's culpability stems from the *non-consensual* nature of the second transfer. That offense thus inherently requires that the recording have been sent to someone other than the person who both willingly participated in and provided the recording to the defendant.[7]

¶46 In contrast, the voyeurism statute applies to situations in which the victim *never consented* to being recorded in the first instance but was instead "secretly or surreptitiously" recorded. There is thus nothing inherent in the base offense which then necessarily requires that subsection (3) apply only to instances in which the defendant sends the recording to a third party. And the particular facts of this case illustrate one reason why the voyeurism statute specifically omits any mention of a "third party" requirement. Kitches all but admitted he sent the video to Ex-Wife to cause her emotional distress when he acknowledged that he sent it as "an implied threat." And Ex-Wife testified that watching the video indeed caused her emotional distress:

> It was probably one of the most emotionally draining things. I—I did not want to watch it. I—

---

7. Or in the parlance of Kitches's preferred definition of "distribution," the individual depicted in the recording always had "access" to it by consenting to being recorded and willingly providing the recording to the defendant. Therefore, sending the recording back to the individual depicted would not achieve the requisite broadening of access.

that was a moment between . . . felt like that was a private moment between the two of us, and it made me feel dirty, and it shouldn't. It made me feel an inch tall. It was embarrassing, humiliating. It was—I should not have had to have watched that or seen that . . . .

¶47    Based on the foregoing, we reject Kitches's statutory arguments and hold that the undisputed evidence that he sent the video to Ex-Wife constitutes "distribution" under subsection (3). We thus reject Kitches's contention that the evidence was insufficient to support his conviction. We likewise reject his related contention that the trial court improperly instructed the jury that it could convict him under subsection (3) if it found that he indeed sent the video to Ex-Wife as described above.

### III. Stalking

¶48    Kitches also assails his stalking conviction on two separate grounds, but both are premised on the notion that the State failed to present sufficient evidence that he engaged in "two or more acts" as are needed to commit the offense. *See* Utah Code Ann. § 76-5-106.5(1)(a) (LexisNexis Supp. 2020).[8] Kitches's first contention is that the trial court should have granted his motion for a directed verdict based on this alleged evidentiary deficiency. Kitches's second contention is that counsel should have objected to a jury instruction—which Kitches asserts did not make sufficiently clear to the jury that it had to find that he engaged in more than one act—and argues that the jury would have acquitted him if the instruction had been clarified because of the same alleged evidentiary deficiency.

---

8. The statutory provisions in effect at the relevant time do not differ from the current provisions in any way material to this case. We thus cite the current Utah Code for convenience.

¶49    Utah Code section 76-5-106.5(2) provides,

> A person is guilty of stalking who intentionally or
> knowingly engages in a course of conduct directed
> at a specific person and knows or should know that
> the course of conduct would cause a reasonable
> person:
>
>> (a) to fear for the person's own safety or the
>> safety of a third person; or
>> (b) to suffer other emotional distress.

*Id.* A crucial element of the offense is thus that the defendant must have engaged in a "course of conduct" directed at the victim. *See id.* Course of conduct is separately defined in the statute as requiring the defendant to have engaged in "two or more acts" proscribed by the statute. *Id.* § 76-5-106.5(1)(a). And the statute provides a broadly inclusive list as to what those proscribed acts are, including,

> (i) acts in which the actor follows, monitors,
> observes, photographs, surveils, threatens, or
> communicates to or about a person, or interferes
> with a person's property:
>
>> (A) directly, indirectly, or through any third
>> party; and
>> (B) by any action, method, device, or means; or
>
> (ii) when the actor engages in any of the following
> acts or causes someone else to engage in any of
> these acts:
>
>> (A) approaches or confronts a person; [or]
>> . . .
>> (D) sends material by any means to the person.

Id.

¶50 We have thus characterized stalking as "inherently an offense of repetition," given the requirement that the actor engage in two or more acts directed at the victim. *Hardy v. Hardy*, 2020 UT App 88, ¶ 6, 467 P.3d 931 (cleaned up). But in determining whether an act counts toward the course of conduct, we have also made clear that the acts must be viewed "cumulatively in light of all the facts and circumstances." *Butters v. Herbert*, 2012 UT App 329, ¶ 12, 291 P.3d 826 (cleaned up). So, although a single incident may not appear to be a qualifying act directed at the victim, an objective evaluation of all the circumstances—particularly the nature and timing of the acts—may indeed show that the incident was part and parcel of a broader course of conduct directed at the victim. *See Ragsdale v. Fishler*, 2020 UT 56, ¶ 37; *Butters*, 2012 UT App 329, ¶ 15; *Ellison v. Stam*, 2006 UT App 150, ¶ 38, 136 P.3d 1242.

¶51 To be frank, the State introduced an arsenal of evidence to show that Kitches engaged in "two or more acts" directed at Ex-Wife. First, the evidence demonstrated that he "monitor[ed]" Ex-Wife's text messages for approximately two weeks. *See* Utah Code Ann. § 76-5-106.5(1)(a)(i). Next, the evidence demonstrated that Kitches "confront[ed]" her about the content of her text messages on several occasions—in one specific example, he confronted her about sending "half naked pics" which he admitted to intercepting and saving. *See id.* § 76-5-106.5(1)(a)(ii)(A). Moreover, Kitches explicitly "threaten[ed]" Ex-Wife on no fewer than three occasions that he had a video of them having sex and would send it to her family, friends, employer, and Boyfriend.[9] *See id.* § 76-5-106.5(1)(a)(i). Each of

---

9. We need not parse the record for each and every time Kitches threatened Ex-Wife. Instead, we simply note that explicit threats were made on September 5, 7, and 8. And because these threats

(continued…)

these explicit threats counts as a separate act toward the course of conduct, and thus the course of conduct element is met by this undisputed evidence alone. Kitches also "communicat[ed]" to Ex-Wife that he had shared the video with his co-workers,[10] and later "sen[t]" the video to Ex-Wife as an "implied threat." *See id.* § 76-5-106.5(1)(a)(i), (ii)(D). He also "monitor[ed]" Ex-Wife on the morning of September 10 when he drove by her house at 2:00 a.m. to ascertain her whereabouts and then "follow[ed]" her to Boyfriend's house, where he then "confront[ed]" her about being there. *See id.* § 76-5-106.5(1)(a)(i), (ii)(A). So as to not belabor the point, we end our recitation of the supporting evidence here.

¶52   Kitches specifically takes issue with only two of the above-recited acts. As a result, we need not engage with Kitches's arguments because, even if correct, he still fails to challenge the bevy of other distinct acts in which he engaged that establish the course of conduct element.[11] We thus reject

_____

(…continued)

were made on different dates, in tandem with other factual circumstances surrounding them, there is no question that they constitute "distinct acts." *See Hardy v. Hardy*, 2020 UT App 88, ¶ 8, 467 P.3d 931 (explaining that to be "distinct," acts "must be distinct in time or purpose").

10. That this statement apparently was untrue does not negate that this was a qualifying act. Indeed, the fact that Kitches lied about showing his co-workers the video suggests that he intended to cause Ex-Wife emotional distress by relaying the false information.

11. We note that, throughout his brief, Kitches repeatedly attempts to excuse his conduct by suggesting that nothing he did was "directed at" Ex-Wife, and that he was instead motivated only out of concern for the well-being of his children. This

(continued…)

Kitches's contention that the evidence was insufficient to support his conviction for stalking.

¶53 And we reject Kitches's ineffective assistance claim regarding the allegedly erroneous jury instruction for largely the same reason. To prevail on this claim, Kitches must show that counsel's failure to object to the alleged error "prejudiced the defense." *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871 (cleaned up). And even assuming the jury was erroneously instructed that it could convict Kitches of stalking if it found that he engaged in fewer than two acts and that counsel should have objected to the instruction, "[t]he burden is on [Kitches] to demonstrate a reasonable probability that the outcome of his . . . case would have been different absent counsel's error." *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350; *see also State v. Grunwald*, 2020 UT 40, ¶ 22, 478 P.3d 1 ("When applying [the] prejudice analysis in the context of erroneous jury instructions, we must

_____

(…continued)

argument misses the mark. *See Ragsdale v. Fishler*, 2020 UT 56, ¶ 32 ("[R]egardless of whether a petitioner is a respondent's ultimate target, the fact that the respondent engaged in any act proscribed by the statute two or more times makes his or her conduct 'directed at' the petitioner."). And even if his subjective motivations were dispositive, the record before the jury firmly belies the notion that his conduct was motivated solely out of concern for his children. The mere acts themselves (especially when viewed in totality) would allow the jury to reasonably infer that all of Kitches's conduct was directed at Ex-Wife for the subjective purpose of causing her emotional distress. And Kitches's own statements bear this out. For example, his admission that he followed Ex-Wife to Boyfriend's house at 4:00 a.m. to "make a point" and instill fear allowed the jury to reject Kitches's overtures about any purported concern for his children.

determine whether there is a reasonable probability the jury would not have convicted the defendant if the jury instructions had been correct."). Given that the evidence demonstrated that Kitches engaged in numerous acts directed at Ex-Wife—most of which he does not even dispute—he cannot demonstrate a reasonable probability that the jury would have acquitted him if the instruction had been perfectly accurate.[12]

---

12. Although not strictly necessary, we also note that counsel did not perform deficiently. As initially constructed, the jury instruction was legally incorrect. The written instruction moved the "two or more acts" requirement from Utah Code section 76-5-106.5(1)(a) into subsection (1)(a)(i)—i.e., the instruction implied that the jury could convict Kitches of stalking if it found that he engaged in one solitary act proscribed under subsection (1)(a)(ii). But counsel objected to this error as the court read the instruction aloud to the jury. The court held a brief sidebar and agreed that the instruction was in error. It then orally instructed the jury that the two or more acts requirement applied to both subsections. The court also instructed the jurors to make alterations to their respective written instructions, such that the jurors each had legally correct written instructions. On appeal, Kitches tacitly acknowledges that the corrected instruction "tracked the statutory definition" but asserts that counsel nevertheless should have objected *again* because "[t]he altered written instruction [was] messy and confusing . . . [and] [t]he court's verbal explanation of what should be corrected [was] similarly perplexing." But Kitches fails to offer any explanation as to how the corrected instruction was "messy," "confusing," or "perplexing." Kitches has thus failed to demonstrate deficient performance. The court's corrected instruction properly instructed the jury on the elements of the offense, and thus counsel had no reason to further object to it. *See State v. Powell*,

(continued…)

## IV. Trespassing

¶54   Finally, Kitches contends that the State failed to present sufficient evidence to support his conviction for criminal trespass. As he did at trial, Kitches concedes that he did enter Ex-Wife's parents' house on the morning of September 10 but primarily argues that he reasonably believed he had permission to enter the house that morning. He essentially argues that the testimony of Ex-Wife's father conclusively established this fact. As is relevant, Ex-Wife's father testified that, during Kitches's marriage to Ex-Wife, Kitches had "permission to enter [his] home, especially for the children," but after the divorce, his contact with the household was limited to dropping the children off on Wednesday and Friday mornings.

¶55   A defendant is guilty of criminal trespass if the defendant (1) knowingly[13] "enter[ed] or remain[ed] unlawfully" on

(…continued)
2020 UT App 63, ¶ 24, 463 P.3d 705 ("If the instruction was correct, [the defendant] cannot establish deficient performance for failing to object to it.").

13. The jury was instructed that Kitches must have knowingly entered or remained on the property. The State argues that "[b]ecause the trespass statute does not include a mental state for the entering element, the State only had to prove that [Kitches] acted at least recklessly as to that element" but asserts that the mental state is essentially irrelevant here, arguing that the evidence was nevertheless sufficient to demonstrate that Kitches knowingly entered the house unlawfully. We agree that the evidence was sufficient to show that Kitches knowingly entered the house unlawfully, and thus we simply couch the elements and our resultant conclusions as such, without need to decide the issue.

property, and (2) was "reckless as to whether [their] . . . presence [would] cause fear for the safety of another." Utah Code Ann. § 76-6-206(2)(a); *see also id.* § 76-2-103(2) ("A person engages in conduct . . . [k]nowingly, or with knowledge, with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances."); *id.* § 76-2-103(3) ("A person engages in conduct . . . [r]ecklessly with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur."). So long as the foregoing elements are met, the defendant is guilty of the offense even if entry onto the property was brief. S*ee State v. Powell*, 2013 UT App 64, ¶ 4, 298 P.3d 1289 (per curiam) ("This testimony is sufficient for the jury to find that [the defendant] was inside the apartment, even if only briefly. Accordingly, the evidence was sufficient to support the conviction for criminal trespass.").

¶56    Kitches argues that the State failed to introduce sufficient evidence to show that he either knowingly entered the house unlawfully or was reckless as to whether his presence in the house would cause fear for the safety of another. In so arguing, he characterizes Ex-Wife's father's testimony as establishing that, during the marriage, he had permission to enter the house provided that his entry "related to the children," and because no one told him that these privileges of entry had been revoked or narrowed, he reasonably believed he had permission to enter the house on September 10 to check on his children. Based on this premise, he argues that the evidence necessarily was insufficient to show that he had the requisite mental state to unlawfully enter the home. He likewise argues that because he reasonably believed he had permission to enter the house, the State necessarily failed to show he was reckless as to whether his presence would cause fear for the safety of another, especially since he did not "disguise himself or sneak around [the] house."

¶57    We disagree. First, the bare factual circumstances—which were not in dispute at trial or on appeal—permitted a reasonable inference that Kitches knowingly entered the house unlawfully. Kitches entered the house at an unusually early morning hour (5:00 a.m. on a Sunday), did so by sneaking around the back of the house, silently entered through an unlocked door, and failed to announce his presence to anyone in the house. From these facts alone, the jury could infer that Kitches silently entered and moved throughout the house because he knew his entry was unlawful and thus intentionally tried to conceal his presence. And to this point, Kitches initially lied both to Ex-Wife and the police about entering the house, categorically denying that he did so. This further suggested that he knew he did not have permission to enter the house. One would expect that an individual who honestly believed they had permission to enter the house would simply advance that understanding—especially to the police—rather than denying entry altogether. Kitches's discussion about his purportedly reasonable belief that he had permission to enter the house that morning is, at most, conflicting evidence of his mental state that was solely within the jury's province to weigh and reject. *See supra* ¶ 35.

¶58    With the foregoing in mind, the State also presented sufficient evidence that Kitches was reckless as to whether his entry would cause fear for the safety of another. Kitches snuck into an occupied residence through the back door at 5:00 a.m. In other words, his entry occurred in a manner and at a time that would suggest to reasonable occupants that the house was being burglarized. *See, e.g., State v. Sisneros*, 631 P.2d 856, 859 (Utah 1981) (noting that "[w]hen one breaks and enters a building in the nighttime, without consent, an inference may be drawn" that the defendant committed burglary). Based on this, the jury could permissibly conclude that a reasonable person would know that such an entry would create a substantial and unjustifiable risk that an occupant would fear for personal safety on seeing a

potential intruder—which, as Ex-Wife's father testified, is exactly what happened here. Correspondingly, the jury could reasonably infer that Kitches was subjectively aware of and disregarded this risk. And again, the fact that he did not disguise himself before breaking into the home is only conflicting evidence of his mental state which the jury was free to disregard. *See supra* ¶ 35.

¶59    Based on the foregoing, we reject Kitches's contention that the State did not present sufficient evidence to support his conviction for trespassing.

## CONCLUSION

¶60    We reject each of Kitches's contentions in which he seeks reversal of his convictions on the basis that the evidence was insufficient to support them. And for related reasons, we reject his contentions in which he seeks remand of his voyeurism-distribution and stalking convictions.

¶61    Affirmed.

————————